C. N. ROBERTS, Trustee, Appellant, v. WALTON OZIAS et al.,
                        Appellees.

PLEADING: Defense in General—Failure to Question Insufficient
1, 5 Defense—Effect. A legally insufficient defense, unquestioned by
    motion, demurrer, or reply, is good.

BILLS AND NOTES: Action—Defense—Payment. Evidence re-
2 viewed, and held sufficient to show that the notes sued on had
    been partially paid.

EVIDENCE: Parol as Affecting Writing—Agreement as to Endorse-
3 ments. A promissory note is in no wise varied by oral evidence
    to the effect that certain funds, belonging to the makers, and
    to be subsequently collected by the payee, should be endorsed
    on the note.

EVIDENCE: Admissions—Books of Accounts of Adverse Party.
4 Entries in the books of accounts kept by the adverse party, and
    in the nature of admissions on a material issue, are admissible.

PLEADING: Defense in General—Failure to Question Insufficient
1, 5 Defense—Effect.

*Appeal from Buchanan District Court.*—FRANKLIN C. PLATT,
                        Judge.

SATURDAY, MAY 12, 1917.

ACTION on promissory note resulted in judgment for
defendants. The plaintiff appeals.—*Affirmed.*

*Hasner & Hasner,* for appellant.

*L. H. Salinger, Chappell & Todd,* for appellees.

LADD, J.—The plaintiff is trustee in bankruptcy of the
copartnership, Kiefer Brothers' Banking Company, com-
posed of Adam, John and W. H. Kiefer, and, as such,
brings this action on a promissory note of $880, dated April
25, 1910, payable 10 months thereafter, with interest at the
rate of 6 per cent per annum. This note was executed by
defendants with John Kiefer to the Gaylor-Kiefer Realty

Company, and endorsed by the latter. Defendants answered that, in 1909, Adam Kiefer, acting for said realty company, sold for defendants Ozias, Kortemeyer and Bahmler, a tract of land in New Mexico, obtaining $6,000 therefor, and turned the same over to the realty company; that said Kiefer, acting for said realty company, sold to these defendants a section of land in Texas, in consideration for which they executed the note in suit and two others for $5,000 each to said realty company; that—

"A controversy having arisen as to whether one half of said 640 acres was of any value whatever, and these defendants making claim that said one half was worthless and should not be paid for, the said realty company agreed in writing, which is attached hereto, by copy, as a part hereof, and marked Exhibit A, to convey to these defendants 160 acres, in settlement of said controversy. Defendants allege that said realty company has failed to make such conveyance, and that the said 160 acres of land was and is reasonably worth at least the sum of $5,440, no part of which has been paid these defendants, nor has anything been done in any way to indemnify these defendants on account of the failure to convey said 160 acres."

It was further alleged that Adam Kiefer was at all times a member of the banking company; that said company, at the time of acquiring the note, had full notice and knowledge of all the matters pleaded. By way of amendment, these defendants say that:

"As to all the transactions heretofore recited, said Adam Kiefer had full knowledge, and that he was actively engaged in the conduct thereof; that, after the note now in suit, together with the two others, had become the property of the Kiefer Brothers' Banking Company named in the title hereof, the said Adam Kiefer, on behalf of the said banking company, orally agreed with these defendants that the sum of $6,000 which had been realized from the sale of

said New Mexico lands should be endorsed upon the said notes, of which the note in suit is one, and defendants aver further that said endorsement was never made."

They further alleged:

"That the sums realized from the said sale had come into the possession of the said Kiefer Brothers' Banking Company at and before the time when the said oral agreement to make the endorsement was so made;   *   *   *

"That the said Kiefer Brothers' Banking Company, acting through said Adam Kiefer, orally agreed to make the said endorsement for and in consideration of thereby becoming the owner of and subrogated to all the rights and claims that these defendants then had, or had theretofore had, against the said original payee of said notes."

I. Whether the matters so pleaded were legally sufficient as a defense was not questioned by motion, demurrer or reply, and therefore, if established by the evidence, must prevail. *Ormsby v. Graham,* 123 Iowa 202, 211.

1. PLEADING: defense in general: failure to question insufficient defense: effect.

Our inquiry, then, will be directed to ascertaining whether the allegations of the answer were proven. The evidence disclosed that defendants Ozias, Bahmler and Kortemeyer, with Adam Kiefer, purchased a section of land in New Mexico of the Gaylor-Kiefer Realty Company, each taking a quarter; that they improved it together; that subsequently it was sold by the realty company at a price such as to entitle each to about $2,000 out of the purchase price. On April 25, 1910, defendants bought of the realty company Section 40, Block 4, in Crane County, Texas, for a consideration of $10.880. A contract was entered into, and the note in suit, and two others of $5,000 each, executed for the purchase price. Subsequently, a deed of the land was made by Adam Kiefer to these defendants. Before making

2. BILLS AND NOTES: action: defense: payment.

these notes, Kortemeyer objected to doing so unless the $6,000 owing on the New Mexico land were endorsed. The excuse for not doing so was that the deal had not been closed, and an understanding was had that, as soon as it was closed, this should be done. This was said by Adam in presence of Earl Kiefer. Thereafter, upon inquiry by Kortemeyer, Adam Kiefer stated several times that the sale of the New Mexico land had been closed, but that he did not have the notes, and that he would endorse the $6,000 as soon as he could get them. That the deal had been closed was reported to Kiefer by the secretary of the realty company, who made the sale, and it will be recalled that the sale of the Texas land was made by the same company; so that the $6,000 must have been collected by this company, and with the understanding that it was to be endorsed on the notes taken for the Texas land, as the arrangement was made in pres- ence of its secretary. Kiefer Brothers' Banking Company acquired the notes of the realty company with knowledge of such arrangement, and we think it fairly to be inferred that the money to be received on the New Mexico land ac- tually passed to the banking company, and, if so, it should be treated as applied on any of these notes in the hands of the trustee in bankruptcy. The regular ledger of the bank- ing company contains the following statement:

Kortemeyer & Co.  Las Vegas, N. M.

| 1909 | |
|---|---|
| June 30, Balance above | $2,304.63 |
| July 30, Geo. A. Fleming, Ins. | 32.00 |
| May 10, Int. on $2,336 | 176.72 |
| Plowing 80 a. $2.50 | 200.00 |
| Well equipment | 110.65 |
| Balance (red ink) | 5,236. |
| | $8,300.00 |

W. A. K. ....................................$1,990.25
W. O. ...................................... 1,990.25
C. Bahmler ................................ 1,990.25
A. K. ..................................... 1,990.25

[Other side of ledger.]

Feb. 1.   10   By large mules ...................$   450.00
Feb. 1.   10   By small mules ...................    250.00
Feb. 1.   10   By 160 a. land ...................  2,000.00
Apr. 1.   10   By 160 a. land ...................  2,400.00
Apr. 1.   10   By 160 a. land .................  3,200.00

                                              $8,300.00

Sept. 1.   10   160 acres sold ...................$2,400.00
      Int. on $5,236 from April 23 to Feb. 1, '11....   265.00
      Int. on $2,000 to Feb. 1, '11 ...............    60.00

The above account, below the figures $8,300, on both sides of the ledger, is in pencil marks. Adam Kiefer testified that the account was what it purports to be, and that the letters W. A. K. represented Kortemeyer, C. B. represented Bahmler, and W. O. represented Ozias, and that the lower part indicated the amount to which each was entitled out of the deal on the New Mexico land; that they were made after the land was sold and "after we knew what the price was to be;" that the entries were estimates of what each one would get. In answer to a question as to the object of putting down the items, he answered:

"These figures were put down there to determine as to what the syndicate would have, each of us, when this settlement was made and the land sold according to our agreement, just what it could be sold for, and those mules were bought at the time these parties went down to improve the land."

He testified further that the banking company did not receive the respective amounts at the *times* credited.

"Q. Did they (defendants and Adam Kiefer) at any time receive the item of April 1, 1910? A. Not on that date especially. * * * These figures were put there for the purpose of determining the amount due each member of the syndicate, that would show the amount due the syndicate divided up into four parts, with these other credits below that would indicate the amounts assigned to each party of the syndicate. * * * When those pencil entries were made in this account, it had been represented to us that this New Mexico land had been sold for a certain price. Mr. Earle Kiefer, of the Gaylor-Kiefer Realty Company, made that representation—represented that to our syndicate—and those figures were put down there upon that representation as made by him, supposing his representations to be true. At this price so represented by Earle Kiefer, the Gaylor-Kiefer Realty company would have been owing to each of us the sum of $1,990.25. * * * Q. And there is nothing on these books that shows that they ever paid a cent of that money, is there? A. Not through their own hands. * * * Q. And after they sold it, the Gaylor-Kiefer Realty company owed to your syndicate these several sums of money here? A. Yes, sir. Q. But you haven't got anything to show that they ever paid them, have you? A. Not in separate amounts."

On redirect examination, the witness was asked, referring to the upper portion of the account:

"Q. Oh, that makes the four quarters, and then interest on $5,236 from April 2—$265, again interest on $2,400 to Feb. 1, 1911, $60; now, did those represent any payment of money with Kiefer Brothers' Banking Company —Kiefer Brothers' Banking Company get any money from that syndicate such as is entered there? A. Well, not just those amounts."

He then testified that the amount entered as due each was owing by the realty company.

"Q. Did that syndicate ever pay to the Kiefer Brothers' Banking Company that $3,064 in cash—this amount here represented in this cash transaction? A. Why, if it was paid in, it was paid in by the Gaylor-Kiefer Realty Company through the various items in their account. Q. Yes? A. It might have been reckoned in their account."

It will be noted that the witness does not deny that the banking company had received from the realty company the proceeds of the New Mexico land, but admits that it might have been paid in and entered in the realty company's account. The statement of the account is inconsistent with his explanation, and the circumstance that credits appear for sales at different times and that interest on sums on hand is computed and credited, is strongly corroborative of Kortemeyer's testimony of Kiefer's repeated admissions that the banking company had received the money. The evidence has convinced us that the banking company received the $6,000 belonging to these defendants, and, though promising to endorse the sum on their notes, failed to do so.

II. Objection was made to Kortemeyer's testimony that, when the notes were executed, it was agreed that, upon receipt of the proceeds of the New Mexico land, the amount owing these defendants would be endorsed on the notes. How this tended in any manner to vary the terms of the notes, we are at a loss to understand. The oral arrangement was entirely independent of the notes, and related solely to the disposition of funds subsequently to be received. It is said, however, that neither Adam nor Earl Kiefer, in making such arrangement, was acting within the scope of their authority. Let us see. The proceeds from the sale of this land belonged to defendants and Adam Kiefer. Earl Kiefer was secretary of the

3. EVIDENCE: parol as affecting writing: agreement as to endorsements.

realty company which sold the land, and had but one duty to perform with reference thereto, and that was to turn the proceeds over to defendants and Adam Kiefer, or to whomsoever they directed. If so, then the secretary who had made the sale surely was not exceeding his authority in paying over the proceeds on the order of those entitled thereto. Nor does it seem necessary to say anything by way of vindicating Adam Kiefer's authority to receive money for the banking company and do with it as directed by the owner. The notes were prepared by him, and shortly thereafter endorsed over to the banking company. All this surely was within the scope of a partnership doing a banking business, as was the arrangement concerning the disposition of the $6,000 belonging to defendants, when it reached the banking company from the realty company. The trouble with appellant's argument is that it proceeds as though the proceeds of the land belonged to the realty company, whereas the whole transaction related to the disposition of money belonging to defendants. The rulings admitting the evidence have our approval.

III. Objection was made to the statement in the ledger. This was rightly overruled. The entries were by and in the books kept by the adverse party, and were in the nature of admissions tending to show the receipt of the $6,000 by the banking company, as alleged. Their value as evidence depended somewhat on the explanations offered. There was no error. See *Christman v. Pearson,* 100 Iowa 634.

**4. EVIDENCE: admissions: books of accounts of adverse party.**

Something is said in argument as to whether the evidence adduced established a legal defense. It did prove the facts pleaded in the answer as a second defense, and that was enough; for the sufficiency of the

**5. PLEADING: defense in general: failure to question insufficient defense: effect.**

facts pleaded to constitute a defense was not raised in the district court. It is unnecessary to touch upon a matter asserted in the first defense pleaded.—*Affirmed*.

GAYNOR, C. J., EVANS and STEVENS, JJ., concur.