**UNITED STATES v. MAMMOTH OIL CO. et al.**

(Circuit Court of Appeals, Eighth Circuit. September 28, 1926.)

No. 7188.

1. **Mines and minerals ⬤═⇒5—Statute relating to naval petroleum reserves held independent of general statutes affecting public lands, and leasing of reserve without competitive bidding and advertising required was unlawful (Comp. St. §§ 2804i et seq., 4640¼–4640¼ss).**

Act June 4, 1920, § 1 (Comp. St. § 2804i), directing Secretary of the Navy to take possession of naval petroleum reserves, and to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease or otherwise, *held* complete and independent of general statutes relating to public land matters, particularly General Leasing Act Feb. 25, 1920 (Comp. St. §§ 4640¼–4640¼ss), and hence leasing of naval petroleum reserves without competitive bidding and advertising was not unlawful.

2. **Mines and minerals ⬤═⇒2—Statute relating to the conserving, developing, use, and operation of naval petroleum reserves by Secretary of the Navy held not to require him to employ all of methods suggested; "in his discretion" (Comp. St. § 2804i).**

Act June 4, 1920, § 1 (Comp. St. § 2804i), directing Secretary of the Navy to take possession of all properties within naval petroleum reserves, and "to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise," *held* not to require Secretary to employ all the methods suggested; the words "in his discretion" meaning that Secretary should employ any or all of such methods as his discretion indicated.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Discretion.]

3. **Mines and minerals ⬤═⇒5—Under statute relating to naval petroleum reserves, Secretary of the Navy was authorized to exchange royalty crude oil for storage tanks for fuel oil (Comp. St. § 2804i).**

Under Act June 4, 1920, § 1 (Comp. St. § 2804i), authorizing Secretary of the Navy to develop and operate naval petroleum reserves by contract or lease, "and to use, store, exchange, or sell the oil, and gas products thereof," it was not an arbitrary exercise of discretion for Secretary, in exchanging royalty crude oil for fuel oil, to provide also for exchange of crude oil for storage tanks for fuel oil.

4. **Mines and minerals ⬤═⇒5—Navy department's use of royalty oil certificates to prevent proceeds of royalty oil from petroleum reserve going into Treasury held not improper (Comp. St. § 2804i).**

Navy Department's use of royalty oil certificates in payment for storage tanks, though intended to prevent proceeds of sale of royalty oil from naval petroleum reserves going into Treasury of United States, if permitted by Act June 4, 1920, § 1 (Comp. St. § 2804i), was **not** improper.

14 F.(2d)—45

5. **Mines and minerals ⬤═⇒5—Act relating to naval petroleum reserves, under which royalty oil certificates were used to pay for fuel oil storage tanks, held not to invade right of Congress to appropriate funds for naval use (Comp. St. § 2804i).**

Act June 4, 1920, § 1 (Comp. St. § 2804i), authorizing Secretary of the Navy to conserve, develop, use, and operate naval petroleum reserves, and to use, store, exchange, or sell products thereof, *held* not to invade the exclusive right of Congress to appropriate funds for naval use, though under it royalty oil certificates were used to pay for construction of fuel oil storage tanks.

6. **United States ⬤═⇒85.**

A distinction exists between the appropriation of moneys by Congress and use of government property incidental to administration under an adequate grant of authority.

7. **Statutes ⬤═⇒225½.**

Where there are two statutes on same subject, the earlier being special and the later general, a presumption arises, in absence of express repeal or absolute incompatibility, that special statute is intended to remain in force as exception to the general.

8. **Statutes ⬤═⇒225½.**

Specific legislation on particular subject is not affected by subsequent law relating to general subject, which neither refers to the earlier law nor is repugnant nor inconsistent with it.

9. **Mines and minerals ⬤═⇒5—Secretary of the Navy held not to have abdicated powers conferred by statute in favor of Secretary of the Interior, as affects validity of lease of naval petroleum reserve (Comp. St. § 2804i).**

Secretary of the Navy *held* not to have abdicated powers conferred on him by Act June 4, 1920, § 1 (Comp. St. § 2804i), relating to naval petroleum reserves, in favor of Secretary of the Interior, acting under executive order of May 31, 1921, as affected validity of lease negotiated by Secretary of the Interior, in view of control exercised by Secretary of the Navy through a subordinate officer.

10. **Mines and minerals ⬤═⇒5—Lease of naval petroleum reserves and supplemental agreement held not invalid, as establishing fuel depot (Comp. St. § 2804i).**

Lease of naval petroleum reserve, providing for exchange of royalty oil for fuel oil and storage tanks therefor, and supplemental agreement for construction of such tanks, *held* not invalid under Act June 4, 1920, § 1 (Comp. St. § 2804i), as establishing fuel depots, which is a matter for Congress.

11. **Mines and minerals ⬤═⇒5.**

Evidence *held* to sustain government's claim that lease of naval petroleum reserve under Act June 4, 1920, § 1, and supplemental contract, were procured by fraud and corruption (Comp. St. § 2804i).

12. **Fraud ⬤═⇒58(1).**

Fraud is never presumed, but must be established by clear, unequivocal, and convincing evidence.

**13. Fraud ☞50.**

Burden of proof is on party alleging fraud.

**14. Fraud ☞58(1).**

Circumstantial evidence, with proper inferences to be drawn therefrom, may be sufficient to establish fraud.

**15. Fraud ☞58(1).**

Fraud need not be established beyond reasonable doubt.

**16. Evidence ☞54.**

Inferences of fact cannot be drawn from other inferences or rebuttable presumptions, but must arise from circumstances proved.

**17. United States ☞61.**

Fraud on government is committed, if government contracting official receives pecuniary favor from one with whom he contracts, though government may suffer no pecuniary loss, and though contract may be advantageous to it.

**18. Appeal and error ☞1012(1).**

Conclusion of trial court on issue of fraud will not be disturbed, unless appellate court deems it against the weight of evidence or based on mistake.

**19. Appeal and error ☞994(3).**

Appellate court has same right to draw conclusions from silence or evasiveness of witness as has trial court.

**20. Appeal and error ☞842(9).**

Conclusion of trial court as to fraud is mixed one of law and fact.

**21. Trial ☞66—Refusal to reopen case for receipt of material testimony not previously available held error.**

Where, pending suit by United States to cancel lease of naval petroleum reserve, the highest court of Canada decided that resident of Canada was bound to answer questions propounded to him by counsel for the United States, held refusal of trial court to reopen case for receipt of such testimony was error.

**22. United States ☞66.**

Contract made by public official with corporation or firm, from which he accepts employment immediately on retiring from office, should be closely scrutinized.

**23. Evidence ☞76.**

On refusal of litigant to reveal facts within his knowledge, a presumption arises that, if revealed, they would be against him.

**24. Evidence ☞76.**

A plaintiff must produce affirmative proof of facts prima facie sufficient to sustain his contentions before inferences can be drawn from silence of adverse party.

**25. Evidence ☞318(3)—In suit to cancel lease of naval petroleum reserve, bank records concerning particular bonds, found in possession of son-in-law and partner of Secretary of the Interior, held admissible as against objection that they were partly hearsay.**

In suit to cancel lease of naval petroleum reserve as resulting from conspiracy between Secretary of the Interior and S., where it appeared that corporations in which S. was interested had invested in bonds which were afterwards found in possession of son-in-law and partner of such Secretary, held, deposit tickets, book entries, and other records and papers of various banks concerning the handling of such bonds were admissible, as against objection that they were in part hearsay.

**26. Evidence ☞99—In action to cancel lease of naval petroleum reserve, bank records, showing handling of bonds found in possession of son-in-law and partner of Secretary of the Interior, held not inadmissible, as res inter alios acta.**

In suit to cancel lease of naval petroleum reserve as resulting from conspiracy between Secretary of the Interior and S., where it appeared that corporations in which S. was interested had invested in bonds which were afterwards found in possession of son-in-law and partner of such Secretary, held, deposit tickets, book entries, and other records of various banks concerned in handling of such bonds were not inadmissible under rule of res inter alios acta.

**27. Fraud ☞52.**

Great latitude is allowed in introduction of evidence on issue of fraud.

**28. Mines and minerals ☞5—In suit where cancellation of lease of naval petroleum reserve was decreed, companies asserting rights under lease held mala fide trespassers, not entitled to reimbursement for expenditures.**

In suit where cancellation of lease of naval petroleum reserve was decreed for fraud, oil-purchasing company and pipe line company controlled by same individual, controlling corporate lessee, who were asserting rights derived from corporate lessee, held mala fide trespassers on government lands, and entitled to no credit for expenditures made by them.

Appeal from the District Court of the United States for the District of Wyoming; T. Blake Kennedy, Judge.

Suit by the United States against the Mammoth Oil Company and others. From a decree dismissing bill (5 F.[2d] 330), the United States appeals. Reversed and remanded, with instructions.

Owen J. Roberts, of Oklahoma City, Okl., and Atlee Pomerene, of Cleveland, Ohio (Albert D. Walton, of Cheyenne, Wyo., on the brief), for the United States.

Martin W. Littleton, of New York City, John W. Lacey, of Cheyenne, Wyo., and Edward H. Chandler, of Tulsa, Okl. (George P. Hoover, of Washington, D. C., G. T. Stanford, of New York City, Herbert V. Lacey, of Cheyenne, Wyo., R. W. Ragland, of New York City, J. W. Zevely, of Washington, D. C., Ralph W. Garrett, of Tulsa, Okl., and Cravath, Henderson & De Gersdorff, all of New York City, on the brief), for appellees.

Before KENYON and VAN VALKEN-
BURGH, Circuit Judges, and CANT, Dis-
trict Judge.

KENYON, Circuit Judge. This suit is
one in equity brought by the United States in
the District Court of the United States for
the District of Wyoming, to secure the cancel-
lation of a certain lease of date April 7, 1922,
made by the United States with the Mam-
moth Oil Company, one of the appellees, for
the development and exploitation of the oil
and gas within naval petroleum reserve No.
3, in Natrona county, Wyo., embracing ap-
proximately 9,000 acres, commonly known as
Teapot Dome; also to secure the cancellation
of the contract supplemental to said lease
signed February 9, 1923, between the same
parties, on the ground (a) that the lease and
supplemental agreement were fraudulently
secured as a result of a conspiracy between
Albert B. Fall, the then Secretary of the In-
terior, and Harry F. Sinclair, organizer of,
and owner of all the capital stock of, the
Mammoth Oil Company, who negotiated the
lease on behalf of said company; and (b)
that the lease and supplemental agreement
were without authority of law and contrary
thereto.

March 13, 1924, a temporary restraining
order and one appointing receivers for the
property involved were entered. Answers
were filed by all defendants, and the case was
tried in March, 1925, after two continuances
had been granted to the United States of
America, appellant (so hereinafter designat-
ed). The trial court held against the conten-
tions of the United States, and decided that
the lease and supplemental agreement were
not procured by fraud, that there was no con-
spiracy between Fall and Sinclair to defraud
the United States or otherwise, and that both
the lease and agreement were authorized by a
special act of Congress, which took the mat-
ter out of the operation of general laws. Nu-
merous findings of fact were made by the
court, and the bill was dismissed on the mer-
its. Prior to trial the appellant attempted to
secure a continuance in order to procure the
evidence of certain witnesses residing in Can-
ada, particularly one H. S. Osler. The court
refused the request for continuance, and de-
nied the petition to reopen the case after trial
and before decree, in order to permit the Unit-
ed States to then secure the evidence of the
said Osler and other Canadian witnesses; the
appellate court of Ontario having in the
meantime held that answers must be made to
the questions theretofore propounded to Os-
ler in the attempt to take his evidence prior
to trial.

Sixty-four assignments of error are pre-
sented. They relate to the validity of the ex-
ecutive order of President Harding of May
31, 1921, under which the administration of
naval reserves was committed to the Secretary
of the Interior; to the question of alleged
fraud; to the action of the court in striking
from the record certain exhibits and testi-
mony; to the action of the court in sustaining
the refusal of M. T. Everhart, son-in-law of
Secretary Fall, to testify on the ground of in-
criminating himself; to alleged abuse of dis-
cretion in denying the motion for continu-
ance, and in refusing to reopen the case after
hearing and before decree in order to secure
the evidence of said Osler. The vitally im-
portant questions presented may be grouped
as follows:

(a) Was there authority of law to make
the lease of April 7, 1922, and the supplemen-
tal agreement of February 9, 1923, and were
they made in compliance with law?

(b) Were the lease of April 7, 1922, and
the supplemental agreement of February 9,
1923, procured by fraud, as claimed by the
appellant?

(c) Was there an abuse of discretion in
not granting the continuance asked for to se-
cure certain evidence or in refusing to re-open
the case for that purpose?

### I. History and Facts.

It is advisable briefly to review the situa-
tion with reference to its historical aspect and
the matters leading up to the execution of the
lease and supplemental agreement. What the
policy of the federal government may have
been as to oil and mineral lands in the past,
or whether it had any policy, may not be
clear. However, on September 27, 1909, a
federal order was issued, withdrawing as part
of the public domain part of the oil lands now
constituting a portion of naval reserve No. 3,
the subject of this controversy. June 18,
1910, another executive order was issued to
the same effect, covering other lands now in-
cluded in said naval reserve No. 3. April 30,
1915, naval petroleum reserve No. 3 was
created by executive order. The General
Leasing Act applying to oil and gas lands be-
came a law February 25, 1920 (chapter 85,
§§ 1–38, 41 Stat. 437 [Comp. St. Ann. Supp.
1923, §§ 4640¼–4640¼ss]). After the pas-
sage of this act it was reasonably probable
that the Salt Creek field bordering naval re-
serve No. 3 would be partially, if not entire-
ly, developed, and that this would probably
affect the question of drainage as to said na-

val reserve. Other naval reserves would also be affected by development of adjacent territory. Actuated presumably by said situation Congress passed the Act of June 4, 1920, c. 228, § 1, 41 Stat. 813 (Comp. St. Ann. Supp. 1923, § 2804i). This section was contained in the Naval Appropriation Act of June 4, 1920, and is as follows:

"The Secretary of the Navy is directed to take possession of all properties within the naval petroleum reserves as are or may become subject to the control and use by the United States for naval purposes, and on which there are no pending claims or applications for permits or leases under the provisions of an act of Congress approved February 25, 1920, entitled 'An act to provide for the mining of coal, phosphate, oil, oil shale, gas, and sodium on the public domain,' or pending applications for United States patent under any law; to conserve, develop, use, and operate the same in his discretion, directly or by contract, lease, or otherwise, and to use, store, exchange, or sell the oil and gas products thereof, and those from all royalty oil from lands in the naval reserves, for the benefit of the United States: And provided further, that the rights of any claimant under said Act of February 25, 1920, are not affected adversely thereby: And provided further, that such sums as have been or may be turned into the Treasury of the United States from royalties on lands within the naval petroleum reserves prior to July 1, 1921, not to exceed $500,000, are hereby made available for this purpose until July 1, 1922: Provided further, that this appropriation shall be reimbursed from the proper appropriations on account of the oil and gas products from said properties used by the United States at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct."

Prior to the time that Mr. Denby and Mr. Fall became respectively on March 4, 1921, Secretaries of the Navy and of the Interior, some leases requiring drilling had been made by the retiring Secretary of the Interior for oil drilling on lands in the Salt Creek field, and he had also offered other leases for sale at public auction subsequently to be held. In May, 1921, Secretary Denby suggested to the President that the Secretary of the Interior be placed in charge of the administration of the naval reserves. Secretary Fall on May 11, 1921, wrote to Secretary Denby concerning the matter, and inclosed a letter for him to sign and send to the President, together with an executive order for the President's signature, placing in the Interior Department the control and development of the naval reserves. There was opposition to this order in the Navy Department, and changes were made therein which were assented to by Secretary Fall. The order as finally agreed upon by Secretary Denby and Secretary Fall was taken to the President by Assistant Secretary of the Navy Roosevelt, and signed by the President May 31, 1921. It is as follows:

"Under the provisions of the Act of Congress approved February 25, 1920 (41 Stat. 437), authorizing the Secretary of the Interior to lease producing oil wells within any navy petroleum reserve; authorizing the President to permit the drilling of additional wells or to lease the remainder or any part of a claim upon which such wells have been drilled, and under authority of the Act of Congress approved June 4, 1920 (41 Stat. 812), directing the Secretary of the Navy to conserve, develop, use and operate, directly or by contract, lease, or otherwise, unappropriated lands in naval reserves, the administration, and conservation, of all oil and gas bearing lands in naval petroleum reserves Nos. 1 and 2, California, and naval petroleum reserve No. 3 in Wyoming and naval shale reserves in Colorado and Utah, are hereby committed to the Secretary of the Interior subject to the supervision of the President but no general policy as to drilling or reserving lands located in a naval reserve shall be changed or adopted except upon consultation and in cooperation with the Secretary or Acting Secretary of the Navy. The Secretary of the Interior is authorized and directed to perform any and all acts necessary for the protection, conservation and administration of the said reserves subject to the conditions and limitations contained in this order and the existing laws or such laws as may hereafter be enacted by Congress pertaining thereto.

"Warren G. Harding.
"The White House, May 31, 1921."

July 8, 1921, Secretary Fall wrote to Mr. Doheny, who was interested in a lease upon other naval reserves, as follows:

"There will be no possibility of any further conflict with Navy officials and this department, as I have notified Secretary Denby that I should conduct the matter of naval leases under direction of the President, without calling any of his force in consultation, unless I conferred with himself personally upon a matter of policy. He understands the situation and that I shall handle matters exactly as I think best, and will not consult with any officials of any bureau of his department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy."

On July 23, 1921, Secretary Fall wrote Secretary Denby as to the use of the government's royalty crude oil in exchange for storage facilities. This letter is as follows:

"In connection with the recent authorization to the Pan-American Petroleum Company and the United Midway Oil Company to drill 22 offset wells in naval petroleum reserve No. 1, California, I would like to be advised, as promptly as possible, what arrangements the Navy desires to be made for the handling and disposition of its royalty oil from said wells, as well as from any other wells in naval reserves, to which the Navy is entitled to royalty in kind.

"As the lease provides that purchasers will take care of the oil only for a limited period, it is important that provision be made to dispose of same promptly. I suggest the desirability of effecting an exchange of the crude oil received as royalty for an equivalent value of fuel oil, to be stored without expense to the United States by the other party to the exchange, preferably the exchange should be not only of crude oil for fuel oil in storage but for the tanks containing the Navy's stored oil. In other words, my suggestion is that the crude oil be exchanged for tanks and fuel oil, the title to both to be vested in the Navy as a result of the exchange. If this plan meets with your approval, and you desire me to undertake to consummate the arrangement, I shall be glad to do so. In any event, I should like to hear from you on the subject as soon as possible."

Secretary Denby acquiesced in this suggestion by letter of July 29, 1921, as follows:

"Replying to your letter of the 23rd of July, I am glad to acquiesce in the suggestion made by you. It will be of great benefit to the Navy to have the royalty crude oil from wells on the naval reserves (both those already in operation and those to be drilled by the Pan-American Petroleum Company and the United Midway Oil Company) exchanged for fuel oil at tidewater, to be stored if practicable without expense to the government, and if possible for tanks in which such fuel oil can be stored. As the Navy has no appropriation to pay for the cost of construction of tank storage, the acquisition of tanks by exchange for crude oil from naval reserve wells will be most acceptable.

"While these tanks could be readily utilized at any point at tidewater, the usefulness to the Navy would be increased if they could be located at any one of the following points: San Diego, San Pedro, San Francisco Bay, Puget Sound, Honolulu, or Pearl Harbor, Hawaii. In view of the greatly reduced amount available under the appropriation 'fuel and transportation' for the present fiscal year, it would be of special benefit to the Navy to obtain royalty fuel oil at this time, as such oil would not involve a charge against the appropriation."

Shortly thereafter Secretary Fall went West to confer with oil men and returned in October, 1921. In September, 1921, Harry Foster Bain, Director of the Bureau of Mines, Department of the Interior, made an inspection trip to the West and inspected naval reserve No. 3. He was accompanied by Arthur W. Ambrose, Chief Petroleum Technologist of the Bureau of Mines. They conferred at Denver with Mr. C. A. Fisher, a geologist, and Mr. Carroll H. Wegemann, who had previously been connected with the Geological Survey, and had made an examination and report as to the geological structure of naval reserve No. 3. In September, 1921, Wegemann submitted a report to the Geological Survey differing somewhat from the previous report in that it placed the saddle between Salt Creek and Teapot Dome further south than in the preceding report. This later report states: "From consideration of the above facts, it is obvious that as wells are drilled along the northwest line of the naval reserve, part of the oil produced by these wells will be drawn from the naval reserve itself."

October 1, 1921, Admiral John K. Robison became Chief of the Bureau of Navy Engineering in charge of the Naval Petroleum Reserves, and on October 8, 1921, took personal charge of all naval petroleum reserve matters on the part of the Navy. In October, 1921, Secretary Fall, Robison, Bain, and Ambrose in conference discussed the Wegemann report recently submitted. As a result of this meeting, through instructions by Secretary Fall to the Director of the Geological Survey, Mr. K. C. Heald was selected to make further investigation of the drainage question as affecting Teapot Dome. He submitted a written report on November 30, 1921, which contains the following:

"At the present rate of production a year or more must elapse before any part of the reserve is appreciably damaged. Only one producing well has been drilled within one location of the line of the reserve, and this well will not be likely to affect the territory more than 300 to 400 feet distant for some months. That part of the reserve which it will affect must be regarded as one of its poorest portions. * * * No further leasing should be done. The lands last leased will permit some slight drainage of unleased land within the

reserve, but this is unavoidable, if an effective barrier is to be maintained between the producing wells and the underground storage."

On October 25, 1921, Secretary Denby wrote Secretary Fall as follows:

"Rear Admiral J. K. Robison reported to me that, as a result of his interview with you on Saturday, October 22, the following general agreement in connection with the naval petroleum reserves was reached:

"1. That arrangements will be made by the Interior Department to have naval petroleum reserves Nos. 1 and 2 drilled with offset wells in every case where adjacent property is drilled. * * *

"7. That all leases and contracts, except as provided in paragraph 6, will be arranged and consummated by the Interior Department, copies of same being furnished to the Navy Department as a matter of information and record only. * * *

"9. That the development of naval petroleum reserve No. 3 is not to be undertaken, except to protect the government against depletion of the reserve by other parties."

Secretary Fall ratifying this arrangement, replied:

"Washington, October 30, 1921.

"My Dear Mr. Secretary: I have your letter of October 25 and have just consulted Admiral Robison about the subject-matter. Responding to your request for information as to whether the policies set forth in the letter are agreeable to the Department of the Interior, I can say without hesitation that they are entirely agreeable and will be carried out to the very best of my ability.

"Of course, should any new matter come up at any time, I will unhesitatingly and immediately consult you personally or through Admiral Robison. As to the definite date when you may expect fuel oil as payment of your royalties, I can give you accurate information within a very few days. Several of your wells are coming in, one or two are in, and we can exchange immediately for fuel oil certificates through which you can draw fuel oil as needed at Pacific ports.

"Very sincerely yours, Albert B. Fall."

The question of exchange of royalty crude oil for fuel was discussed November 29, 1921, at a meeting of the Navy Council, which consisted of chiefs of bureaus of the Navy, and as a result Admiral Robison on November 30, 1921, wrote to the Judge Advocate General as follows:

"It is proposed to exchange the royalty crude oil for fuel oil in storage at Pearl Harbor or other points to be later designated by the United States Navy. It is planned that the tanks in which this exchange oil shall be stored shall be provided by the lessor of the oil wells. Will this be legal, it being presumed that the oil in storage at Pearl Harbor, as well as the tanks and appurtenances, are to become the property of the United States?"

The Judge Advocate General on November 30, 1921, answered as follows:

"4. Answering your questions, specifically, you are advised:

"(a) It would be legal to exchange the royalty crude oil for fuel oil in storage at Pearl Harbor or other points to be designated by the Secretary of the Navy under arrangement whereby the exchanged oil (shall) be stored in tanks provided by the lessee of the oil wells, such tanks and their appurtenances to become the property of the United States.

"(b) It would be legal to use the royalty oil on board vessels of the United States Navy, and, if so used, it should be expended at such rate, not in excess of the market value of the oil, as the Secretary of the Navy may direct, and should be debited at the rate so fixed by the Secretary to the appropriation 'fuel and transportation.'"

This opinion was approved by the Secretary of the Navy. Secretary Fall was familiar with a somewhat contrary opinion rendered by the counsel of one of the companies interested in the Pearl Harbor tank-storage matter. December 9, 1921, Assistant Secretary Roosevelt wrote Secretary Fall with relation to the storage of fuel oil in tanks at Pearl Harbor as follows:

"In view of the fact that this project is embodied in the war plans of the Navy Department we request that all the matters in connection therewith be regarded as confidentially as possible."

December 31, 1921, Mr. Sinclair and his counsel, Mr. Zevely, visited Secretary Fall at his home at Three Rivers, N. M. The leasing of naval reserve No. 3 was discussed. After the visit of Sinclair and Zevely to New Mexico, and before Fall's return to Washington, witness Eddy, who was in the General Land Office in charge of leasing oil lands, was instructed by Mr. Safford, Administration Assistant to Secretary Fall, to make a memorandum relating to claims of record on Teapot Dome, the same to be given to the Secretary upon his return. This investigation was conducted by Roy W. Tallman. His report January 12, 1922, referred to the report on the subject of one Glenn B. Morgan (formerly mineral surveyor in the department) of date July 26, 1917. In his report Tallman said:

"It may be stated that there are no mineral claims to any of the lands in the said

Naval Reserve which deserve serious consideration."

When Secretary Fall returned to Washington on January 27, 1922, he had a conference with Bain, Ambrose, and Robison, at which the subject of drainage on naval reserve No. 3 was again discussed. This conference was in the nature of a continuance of the October conference. The opinion of Ambrose and Bain, as expressed at this meeting, was, according to Ambrose's testimony, "that in all probability the drainage at that time was not serious, but that, if the leases in the southern end of the Salt Creek field were developed, they would actually drain the second Wall Creek sand, and that, as time went on, this drainage would become quite serious." Bain, as to the conference, testifies: "I certainly did not realize at that time that that conversation was going to dispose of 9,000 acres of oil land by lease. I know that in that conversation we did enter into the question of whether we ought to do something with regard to No. 3; that is, what they would do." Ambrose was of the opinion that the danger of drainage in naval reserve No. 3 was not immediately serious, but that it would become so as development under the leases of the Salt Creek field proceeded; that it was not such as to necessitate a lease on April 7, 1922. He filed a report on the subject February 18, 1922, having been instructed by Secretary Fall to prepare a memorandum thereon. It contained this:

"In conclusion, it is believed that, if oil is found in the saddle in the second Wall Creek sand, the leases which have been granted along the northern zigzag boundary separating the two structures will result in drainage of this sand in the Teapot Dome during the next six or seven years to a point on the south section line of section 28, T. 39 N., R. 78 W., and if conditions are favorable the productivity of the sand will be affected even farther to the south."

The question of the danger of drainage of Teapot Dome arose entirely as to the second Wall Creek sands. The first Wall Creek sand, according to estimates, contained between 50,000,000 and 55,000,000 barrels of oil, and was sealed off by a water seal from the first Wall Creek sand in the adjoining Salt Creek field, and was not subject to drainage. The second Wall Creek sand was estimated to contain about 85,000,000 barrels.

After the conference in January, 1922, Robison reported to Secretary Denby that the danger of drainage to reserve No. 3 was grave, and recommended that some action be taken. The Secretary became convinced

thereof and instructed him to proceed to accomplish the opening of Teapot Dome reserve as a whole. Robison's reasons for reaching his conclusion as to Teapot Dome, as stated in his testimony, were:

"First, there was the experience we had had in California, where in my opinion we had suffered the loss of several millions of dollars by failing, by delaying too long in putting down offset wells; second, there was what I regarded as a pressing national emergency regarding our state of security; third, and in connection only with the use of the word 'entire,' the leasing of the entire Teapot Dome, there was a conviction in my mind that by handling it as one matter we could make better terms than we could make if we handled it as a series of small affairs; that it would involve much less cost to us and much less trouble to the government and would produce better terms. Further, I was of the opinion that to do it in that way would be the only way in which we could secure the big capital expenditures that would be required on the part of the contractor to accomplish some of the, perhaps, overambitious ideas that I had. Those considerations were the major ones that actuated me. If they were not the only ones, they are the only ones that I now recall. They were all potent in reaching that decision."

Shortly after the decision was reached to open and develop the entire reserve No. 3, Secretary Fall, Sinclair, Zevely, and Robison had a meeting in Fall's office and discussed the subject of a lease thereof. Robison was instructed by Secretary Fall to set forth the Navy's requirements as to a lease. He advised Sinclair that a pipe line must be constructed of adequate capacity to care for the production of the field; that the proceeds from the royalty crude oil should be used in the erecting and building of specified storage facilities on the Atlantic coast; that the royalties were not to be taken in cash, because the cash would have to be covered into the United States Treasury. Robison at that time had no notice as to the outstanding placer mining claims. February 3, 1922, Sinclair submitted a tentative proposition to the Secretary of the Interior as to the terms on which he would undertake the lease. This contained an undertaking to quiet the outstanding placer mining claims known as the Pioneer and Belgo claims. Negotiations continued respecting the terms of the lease over a considerable period of time. There was extended discussion as to the subject of royalties. Likewise the rate of exchange of royalty crude oil for fuel oil. Secretary Fall in-

structed Ambrose (Sinclair and Zevely being present in his office) to prepare a rough draft of a lease embodying the terms of the proposed lease. The lease was prepared chiefly in the Washington office of Mr. Zevely. Mr. G. T. Sanford, also counsel for Mr. Sinclair, attended to the "mechanics of the lease." Fall dictated the preamble and settled the questions that arose, inserted something in the contract with respect to the common carrier, and made changes in the wording of the oil certificates. The draft of this lease was not submitted to any lawyer in the Department of the Interior for an opinion thereon.

February 28, 1922, the Mammoth Oil Company was incorporated by Sinclair, he being the owner of all its capital stock. While the lease and the subject thereof were under negotiation, there was pending in the Department of the Interior application for leases by the Pioneer and Belgo Companies under the Leasing Law of February 25, 1920. The officers of these companies came to Washington and entered into negotiations with Sinclair for sale of their placer mining claims, and a written contract was made dated March 11, 1922, by Mammoth Oil Company with the Pioneer and Belgo Companies, claimants, providing for the payment of the equivalent of $1,000,000 for the claims, subject to the execution of the lease in question here, and quitclaim deeds were executed by the Pioneer and Belgo Companies to the Mammoth Oil Company. On March 11, 1922, the Mammoth Oil Company applied formally to the Secretary of the Interior for a lease of the entire petroleum reserve No. 3, tendering quitclaim deeds to the United States for the Pioneer and Belgo claims, and accompanying the application with a letter from Sinclair to the Secretary of the Interior as follows:

"New York, March 11, 1922.

"To the Honorable the Secretary of the Interior—Sir: The Mammoth Oil Company has this date made application for an oil and gas lease covering that part of the public lands of the United States designated in executive order of withdrawal issued by the President of the United States on April 30, 1915, creating naval petroleum reserve No. 3, Wyoming No. 1, involving 9,321 acres, more or less, situated in Natrona county, state of Wyoming, and more fully described in said application. In the event said application is granted, and a contract of lease is made between the United States and the Mammoth Oil Company covering said lands, I will become the owner of all the capital stock of said Mammoth Oil Company.

"In consideration of the United States granting said application and making a contract of lease with the Mammoth Oil Company, I hereby personally guarantee the performance on the part of said Mammoth Oil Company of all its obligations under said contract of lease. This guaranty shall become effective upon delivery to Mammoth Oil Company by the United States of said contract of lease.

"Respectfully,    H. F. Sinclair."

Secretary Fall signed the lease on April 7, 1922, as Secretary of the Interior, and also subscribed himself "and for the Secretary of the Navy." Secretary Denby formally signed the lease April 12, 1922, after having had it in his possession for a number of days. The preamble of the lease dictated by Secretary Fall contained several paragraphs reciting the objects to be attained, as follows:

"Whereas, the government of the United States is charged with the duty of securing and storing a supply of fuel oil for naval purposes, and is desirous of acquiring suitable storage for such fuel oil at points easily accessible to the United States Navy; and

"Whereas, the government is desirous of avoiding in so far as possible any risks of loss of the supply of crude oil available for the United States Navy by a reduction of gas pressure resulting from the drilling and operating of wells located outside of naval reserve No. 3, Wyoming; and

"Whereas, the government is desirous of creating a competitive market and securing the best prices obtainable for royalty oil received and to be received by the government of the United States from the public domain in the Salt Creek field in Wyoming; and

"Whereas, the government is desirous of exchanging crude oil that may be received by it as royalty from the said naval reserve No. 3, for fuel oil for the use of the United States Navy, and is desirous of securing adequate storage facilities for the storing of such fuel oil as is received by it in exchange for said crude oil over and above the requirements for use of the United States Navy."

Article 1 provides for the leasing of the lands comprising Teapot Dome to the Mammoth Oil Company. Article 2 provides for bond and the sinking of certain test wells and operations concerning the construction of a pipe line, additional wells and fixing royalties to be paid, and that in lieu of delivering royalty oil to the lessor in kind, the lessee shall issue oil certificates to the lessor as evidence thereof. The lease contains this provision:

"The lessee agrees, if and when requested so to do by the lessor, to construct or to pay the cost of construction of steel storage

tankage up to, but not in excess of, such an amount as shall be estimated to be necessary or required for the storage by the lessor of the fuel oil to be received by it as hereinbefore provided in exchange for royalty crude oil from the lands hereby leased; said storage to be constructed as and when the same shall become necessary or shall be required for the storage of such fuel oil so delivered by the lessee or its nominee, and said storage to be located at points designated by the lessor; the cost of such tankage to be liquidated by lessor by delivering to the lessee or its nominee crude oil certificates hereinbefore referred to, said certificates so delivered to be of the face amount in value equal to the cost of such tankage for which the lessee or its nominee shall have paid or become liable."

No public notice of the intent to lease Teapot Dome was ever given. The representatives of various oil companies learning in some way that there was a prospect for the lease of the Dome wrote to or called upon Secretary Fall or other officials of the Navy or Interior Departments. All were unsuccessful, except two parties, viz. John C. Shaffer and possibly Gerald Hughes. Secretary Fall suggested to Sinclair that he wanted Shaffer to have 200 acres of Teapot Dome reserve and Gerald Hughes 80 acres. After conferences between Sinclair and Shaffer, it was agreed that Shaffer should have approximately 400 acres, the record not disclosing the exact amount. Shaffer wired Fall March 23, 1922, thanking him for his interest and help in the matter. Whether Hughes received any of the leasehold the evidence does not indicate. The oil interests applying to Secretary Fall for leases on parts or all of Teapot Dome were the following:

The Producers' & Refiners' Corporation of Wyoming, a company with a capital of more than $50,000,000, was represented by one Frank E. Kistler, who called on Assistant Secretary Finney in March 1922, to discuss the matter. Finney referred him to Secretary Fall, who informed him he was not ready to receive applications or to consider the leasing of reserve No. 3, but promised to notify him and give him an opportunity to bid on the reserve if "he did decide to lease." Kistler heard nothing further until he saw in the newspapers that a lease of Teapot Dome Reserve had been made to the Mammoth Oil Company.

Mr. Amos L. Beaty, president of the Texas Company, with a capital of approximately $165,000,000, sought an interview with Secretary Fall on the subject of leasing Teapot Dome, and had the same on March 30, 1922.

Secretary Fall informed him that he had a satisfactory proposition from Sinclair, but he would be glad to have the Texas Company submit a bid. Secretary Fall also advised him of the outstanding placer mining claims on the reserve, and that it would be his policy to require that these be satisfied, and that the company acquiring and taking care of them would be given preference treatment. He also advised him that Sinclair had acquired these claims. There was some telegraphic correspondence between Secretary Fall and Beaty with reference to Salt Creek prospects.

Birch Helms, vice president of the Texas-Pacific Coal & Oil Company, on or about September 1, 1921, called on Assistant Secretary of the Navy Roosevelt and Judge Finney, Assistant Secretary of the Interior, in regard to leasing of Teapot Dome. He was informed that it was not to be leased. In April, 1922, he called on Secretary Denby with relation to the same matter. Secretary Denby informed him it was out of his hands and in the hands of the Interior Department. He saw Secretary Fall on or about April 10, 1922. Fall told him he would entertain a bid from the Texas-Pacific Coal & Oil Company, first inquiring if it was in any way connected with the Standard Oil, as "he wished this contract to be made with a company independent of the Standard Oil." Helms knew nothing of the lease to the Mammoth Oil Company until April 19, 1922, when he noticed it in a newspaper report from Washington.

Some time after negotiating the lease, the government requested the Mammoth Oil Company, in the exercise of the option provided in the lease (hereinbefore set forth), to provide for the construction of steel storage tanks necessary to store the fuel oil which it elected to receive in exchange for royalty oil. Negotiations were entered into between representatives of the Mammoth Oil Company and of the United States respecting the preparation of a supplemental agreement to provide for the storage of fuel oil in accordance with said option. These negotiations culminated in the execution of what is known as the supplemental agreement of February 9, 1923. Secretary Denby and Secretary Fall signed the supplemental agreement on behalf of the United States. Robison testifies that before Secretary Denby signed it he had gone over it thoroughly and familiarized himself with it; that he assisted the Secretary of the Navy in doing this. This contract, which is inextricably interwoven with the lease, provides for the construction by the Mammoth Oil Company of storage tankage and facilities at the navy yard at Ports-

mouth, N. H., the naval fuel depot, Melville, R. I., Governor's Island, Boston Harbor, and naval fuel station, Yorktown, Va.

Appellees, Sinclair Crude Oil Purchasing Company and Sinclair Pipe Line Company, were made defendants because of certain rights derived from the Mammoth Oil Company. Both companies have incurred heavy expenditures in carrying out their obligations to Mammoth Oil Company. The United States alleged in its complaint that both were trespassers. Their rights stand or fall with the lease and contract of the Mammoth Oil Company. We do not further set forth the facts shown by the evidence, as of necessity they must be considered in the discussion subsequently of the question of fraud, and there is no need of duplication. The foregoing covers the important matters leading up to the execution of the lease and contract in question.

II. Legality of the Lease and Contract.

[1] These instruments were made under the authority of the Act of Congress of June 4, 1920 (hereinbefore set out). The government contends that this act is not an independent act, is dependent on other general statutes preceding it, and must be construed in connection therewith. Appellees' contention is that the act is full and complete, covering without reference to other statutes the method of doing the things therein provided. The Act of June 4, 1920, deals entirely with the naval petroleum reserves. These had been only incidentally referred to, if not practically excluded from the Act of February 25, 1920. The purpose of the Act of June 4, 1920, was to preserve the oil in these naval reserves for the benefit of the government in such manner as Congress at that time deemed wise, viz. to place the matter almost exclusively in the hands of the Secretary of the Navy. It is of vital importance that the government's oil in these reserves shall not be drained away for the benefit of private enterprise, but that it shall be preserved in the interest of national defense. This act is as broad as an act dealing with this subject could well be. It confers upon the Secretary of the Navy wide discretion as to administering the naval reserves, directing him to take possession of the properties within the same as are or may become subject to the control and use by the United States for naval purposes, and "to conserve, develop, use and operate" these properties "in his discretion." He may do this directly or he may do it by "contract, lease or otherwise," and he is further given the right to use the oil that may be secured by contract, lease or otherwise, or to "store, exchange or sell" the same.

[2] Counsel for appellees argue that the language of this act compels the Secretary of the Navy to employ all of the methods suggested, and that the term "in his discretion" applies to the method by which he shall "conserve, develop, use and operate." We do not agree with this view. It is apparent that, although the conjunction "and" is used, Congress intended that the Secretary should employ any or all of these methods as his discretion should dictate. Certainly if the oil can be properly conserved in the ground the Secretary of the Navy is not under compulsion to develop the properties. What he does must be for the benefit of the United States. That is the limitation of his discretion. If he shall determine that the oil cannot be properly conserved within the ground, then he has the right to develop, use, and operate the properties directly or by contract, lease or otherwise. Having decided in the exercise of a wise discretion that it is for the interest of the Navy, and therefore of the United States, to develop and operate the properties, he may do this directly, which will require the expenditure of money, or he may do it by contract or by lease. Having made a lease, which in its very nature implies the taking of the oil from the ground, and such oil being crude and not fuel oil in proper condition to be used by the Navy, he may store it. He may sell it, in which case the proceeds must be turned into the Treasury of the United States, or he may exchange the same. While appellant concedes that the right to exchange crude oil for fuel oil is proper and legal, it denies the right to exchange the crude oil for storage facilities for fuel oil.

[3, 4] If the Act of June 4, 1920, as it seems clear it did, authorized the Secretary of the Navy to store the fuel oil, it would follow that it could be stored at established fuel depots, and, if none such existed, then places for the storage of the oil would have to be fixed and provision made for storage tanks. It would not be an arbitrary discretion exercised by the Secretary of the Navy, if he in exchanging royalty crude oil for fuel oil provided also for an exchange of crude oil for storage tanks. There was no restriction upon the Secretary of the Navy as to the amount of oil that he might have extracted from the ground either directly or by contract or lease. The argument does not appear to us sound that under this act it must

be held that the Secretary of the Navy could exchange oil for anything, such as battleships or airplanes, or else that it was limited to exchange of crude oil for fuel oil. If such limitation was intended it would have been a simple matter to have expressed it in the act. It is not for the court to supply the same. The purpose of the act was to protect the oil of the government. It would not be in consonance with the purpose of the act to exchange the oil for battleships or airplanes, or land to raise a food supply for the Navy, or materials to weave cloth for the uniforms of marines, but it would be consonant with the purpose of the act to provide storage places for the oil. And under the act express authority is given to store the oil and gas products received from the naval reserves. It may be that the use of the oil certificates provided in the lease in payment for the construction of storage tanks was intended to prevent the proceeds of the sale of the oil going into the Treasury of the United States. If Congress, however, had passed an act that permitted this, then the Navy Department had the right to exercise the power so granted.

[5, 6] Nor do we think the act invaded the exclusive right of Congress to appropriate funds for naval uses. There is a distinction between the appropriation of moneys by Congress, and the use of government property incidental to administration under an adequate grant of authority. We are convinced that the appropriation of $500,000 is not a limitation upon the construction of storage tanks. Certainly it does not limit the amount of royalty oil to be exchanged for fuel oil. The appropriation ended July 1, 1922, but the right to arrange for the extraction of oil in the method provided by the act was not limited to July 1, 1922. If the Secretary of the Navy attempted to develop and operate the naval reserves directly, this appropriation would undoubtedly be necessary to commence such operations. It would have been necessary then to call upon Congress for further money, but the appropriation was not necessary where the properties were to be developed by contract or lease. If the Secretary of the Navy should find it essential to immediately develop a naval reserve in order to prevent waste of the oil or depletion thereof by wells on adjacent property, and said oil could not be used for the current needs of the Navy, it would be his duty to store the same or sell or exchange it in his discretion. If it could not be sold, it must be stored, and the appropriation of

$500,000 under circumstances easily imaginable and entirely possible would obviously be inadequate to provide storage facilities, and were Congress not in session no relief from that source could be found. We think the appropriation in the act referred to expenditures made necessary if the Secretary in his discretion entered into a direct development and operation of the properties.

[7, 8] That the Act of June 4, 1920, even though a rider to an appropriation bill, was complete in itself, and that it did not repeal, nor was it dependent on, other acts with relation to the public lands, is our conclusion. It constitutes an exception thereto. In Washington v. Miller, 235 U. S. 422, 428, 35 S. Ct. 119, 122 (59 L. Ed. 295) the Supreme Court said: "Where there are two statutes upon the same subject, the earlier being special and the later general, the presumption is, in the absence of an express repeal, or an absolute incompatibility, that the special is intended to remain in force as an exception to the general." In Witte v. Shelton et al., 240 F. 265, 268, 153 C. C. A. 191, 194, this court said: "Specific legislation upon a particular phase of a single subject is not affected by a subsequent law relating to a general subject which neither refers to the earlier law nor is repugnant to nor inconsistent with it, but the two laws must stand together, the former as the law of its specific phase of the subject, and the latter as the general law relating thereto." Walla Walla City v. Walla Walla Water Co., 172 U. S. 1, 19 S. Ct. 77, 43 L. Ed. 341; Townsend v. Little & Others, 109 U. S. 504, 512, 3 S. Ct. 357, 27 L. Ed. 1012; Kepner v. United States, 195 U. S. 100, 125, 24 S. Ct. 797, 49 L. Ed. 114, 1 Ann. Cas. 655; Rodgers v. United States, 185 U. S. 83, 87, 22 S. Ct. 582, 46 L. Ed. 816; Hemmer v. United States, 204 F. 898, 903, 123 C. C. A. 194; United States v. Matthews, 173 U. S. 381, 19 S. Ct. 413, 43 L. Ed. 738.

This special statute, not repealing the general statutes, the two stand together, one as the law relating to a special thing, viz. the naval reserves; the other relating to general public land matters. It was therefore unnecessary that there be competitive bidding or advertising as to the making of the lease and contract, and other statutes with relation to the method of transacting the general public business of the United States were not applicable to this situation, the special statute fully covering the same.

[9] It is urged that the lease is void because the Secretary of the Navy had abdicat-

ed the powers conferred on him by the act. This record shows great activity on the part of Secretary Fall in leasing naval reserve No. 3, and more or less passivity on the part of the Secretary of the Navy. Fall's letter to Doheny of July 8, 1921 (hereinbefore set out), and Denby's letter to Fall of October 25, 1921, in which he said "that all leases and contracts, except as provided in paragraph 6, will be arranged and consummated by the Interior Department, copies of same being furnished to the Navy Department as a matter of information and record only," would seem to come close to the assumption of exclusive authority by the Secretary of the Interior, and an abdication on the part of the Secretary of the Navy of the powers granted by the Act of June 4, 1920. The executive order of May 31, 1921, however, while giving great power to the Secretary of the Interior, did not of necessity remove absolutely the administration and control of these reserves from the Secretary of the Navy in such a way as to violate the congressional act. In fact, it seemed to retain just enough control in the Navy to be within the law of June 4, 1920. It provided that no general policy as to drilling or conserving lands located in a naval reserve should be changed or adopted, except upon consultation and in co-operation with the Secretary or Acting Secretary of the Navy. The President had no authority to transfer from the Secretary of the Navy to the Secretary of the Interior powers which Congress had provided should be exercised by the former. The validity of this executive order does not seem to have been seriously questioned in the presentation of the case to this court. It was proper, of course, for the Secretary of the Navy to act through competent subordinates. Of necessity this must be so. We conclude that enough control was exercised by the Secretary of the Navy through Admiral Robison to preclude a court from holding that the entire power granted by the Act of June 4, 1920, to the Secretary of the Navy had been assumed by the Secretary of the Interior.

[10] The Act of June 4, 1920, creates no power in the Secretary of the Navy to establish fuel depots. That is a matter for the Congress, long so recognized. The lease, however, does not necessarily involve the establishment of fuel depots other than those existing. It does involve the providing of facilities for storage. Such storage might have been at fuel depots already established, and, so construed, the lease and contract are not open to the objection that by their terms they established fuel depots. Exceeding power granted does not destroy it. We are not satisfied that the acts contemplated by the lease were beyond the authority granted to the Secretary of the Navy, and the supplemental agreement must be considered as merely a necessary incident of the lease. The work thus far done in constructing storage facilities has been at the Portsmouth navy yard. The record does not disclose whether or not this navy yard was a fuel depot.

The Circuit Court of Appeals for the Ninth Circuit in Pan-American Petroleum Co. et al. v. United States, 9 F. (2d) 761, has held that contracts with reference to another naval reserve, executed under the authority of the same act and involving a similar question of legality, were not authorized by the act. With great respect for the ability and learning of that distinguished court, we find ourselves unable to arrive at the same conclusion as to this lease and contract. That case is now in the Supreme Court of the United States and this legal question will there be settled. We content ourselves with saying that on this branch of the case, as at present advised, we are in accord with the conclusion reached by the trial court, that the authority granted by the Act of June 4, 1920, is sufficient to authorize the lease and contract in question.

### III. Fraud.

[11] There is no charge of corruption in this case as to any of the officials of the government, except as to former Secretary of the Interior, Albert B. Fall. It is the theory of the government, bluntly stated, that Secretary Fall received from Harry F. Sinclair, sole owner of appellee, Mammoth Oil Company, a pecuniary consideration which influenced him in granting to said oil company a lease of naval petroleum reserve No. 3, commonly known as "Teapot Dome." Counsel for the United States charge in their brief that Mr. Sinclair received as dividends from the Continental Trading Company, Limited, $230,500 face value, of United States Liberty first $3\frac{1}{2}$ per cent. bonds, which he turned over to Secretary Fall in May, 1922, as a bribe. This charge is as grave and serious an accusation as could be made against a public official, augmented by the fact that the official so charged was in a sense trustee for the people of the United States of their public lands. The case is one, therefore, in which not only the rights of the appellees and the government of the United States are

involved, but the interest of the public likewise.

[12-15] Fraud is not to be presumed. To establish it the evidence must be clear, unequivocal, and convincing, which means there must be sufficient competent evidence, as distinguished from mere suspicion, to satisfy the court trying the question. That is the real test in cases where fraud is an issue. The burden is on the party alleging fraud to show the same. Circumstantial evidence may be sufficient, with the proper inferences to be drawn therefrom, to produce conviction in the minds of the triers of the question that fraud has been committed, yet, if the circumstances are as consistent with honesty and good faith as with dishonesty, the inference of honesty should be drawn. While the law presumes the good faith of business transactions, fraud may be the only legitimate and proper inference that can be drawn from the circumstances disclosed. It is not necessary in a civil action that fraud be established beyond a reasonable doubt. These legal propositions, variously applicable to this case, are well established, and are not, we assume, a matter of controversy here. Jones v. Simpson, 116 U. S. 609, 615, 6 S. Ct. 538, 29 L. Ed. 742; United States v. Maxwell Land Grant Case, 121 U. S. 325, 7 S. Ct. 1015, 30 L. Ed. 949; United States v. Hancock, 133 U. S. 193, 10 S. Ct. 264, 33 L. Ed. 601; United States v. Clark, 200 U. S. 601, 26 S. Ct. 340, 50 L. Ed. 613; Mastin et al. v. Noble et al., 157 F. 506, 85 C. C. A. 98; Glaspie v. Keator et al., 56 F. 203, 5 C. C. A. 474; Foster v. McAlester et al., 114 F. 145, 52 C. C. A. 107; Wilson v. Sands et al., 231 F. 921, 146 C. C. A. 117; Folk et al. v. United States et al., 233 F. 177, 147 C. C. A. 183.

[16] It is the general rule also as to circumstantial evidence that inferences of fact cannot be drawn from other inferences or rebuttable presumptions, but must arise from circumstances proved. Important inferences, however, may legitimately arise from slight circumstances. United States v. Ross, 92 U. S. 281, 23 L. Ed. 707; Missouri K. & T. Ry. Co. v. Foreman et al., 174 F. 377, 98 C. C. A. 281; Manning v. Mut. L. Ins. Co., 100 U. S. 693, 25 L. Ed. 761; Looney v. Metropolitan R. Co., 200 U. S. 480, 26 S. Ct. 303, 50 L. Ed. 564. Persons engaging in conspiracies to commit fraud or to give or accept bribes do not publish their plans to the world, and there is seldom any one who can furnish direct evidence thereof.

[17] If a government official, engaged in making contracts for the government, receives pecuniary favor from one with whom such contracts are made, a fraud is committed on the government, and it matters not that the government is subjected to no pecuniary loss, or that the contract might have been an advantageous one to it. The entire transaction is tainted with favoritism, collusion, and corruption, defeating the proper and lawful function of the government. United States v. Carter, 217 U. S. 286, 30 S. Ct. 515, 54 L. Ed. 769, 19 Ann. Cas. 594; Haas v. Henkel, 216 U. S. 462, 30 S. Ct. 249, 54 L. Ed. 569, 17 Ann. Cas. 1112; Hammerschmidt v. United States, 265 U. S. 182, 44 S. Ct. 511, 68 L. Ed. 968; United States v. Pan-American Petroleum Co. et al. (D. C.) 6 F. (2d) 43; Pan-American Petroleum Co. et al. v. United States (C. C. A.) 9 F. (2d) 761. Nothing is so essential to the perpetuity of representative government as fidelity of public officials. That the highest degree of fairness and honesty is required of them goes without saying, and the same standards apply to those with whom they deal.

[18] In this case appellant claims that the facts and circumstances shown in evidence are sufficient to raise controlling inferences of fraud and bribery, and are inconsistent with any honesty of purpose on the part of Fall and Sinclair. The trial court made findings of fact in this case, one of which is that there was no fraud connected with the negotiation or execution of the lease or the supplemental agreement. Where the trial court has considered conflicting evidence and passed thereon, its conclusion is entitled to great weight, and unless in the opinion of the appellate court it is against the weight of the evidence, or is based on a mistake, will not be disturbed. State of Iowa v. Carr et al., 191 F. 257, 112 C. C. A. 477; Gorham Mfg. Co. v. Emery-Bird-Thayer Dry Goods Co. et al., 104 F. 243, 43 C. C. A. 511; Thallmann et al. v. Thomas, 111 F. 277, 49 C. C. A. 317; United States v. Delatour (C. C. A.) 275 F. 137; Schlafly v. United States (C. C. A.) 4 F. (2d) 195; Fineup v. Kleinman et al. (C.C.A.) 5 F.(2d) 137.

[19, 20] Here the appellate court is not at the usual disadvantage which prevails when the trial court determines the facts. The views of the trial court are not controlling, as the situation presents, not so much a dispute as to the evidence or the veracity of witnesses, as it does an opportunity for differences of opinion with respect to the inferences to be drawn from all the circumstances appearing in the record. This court has the same right to draw conclusions from the si-

lence or evasiveness of witnesses as has the trial court. Central Imp. Co. et al. v. Cambria Steel Co. et al., 201 F. 811, 120 C. C. A. 121; Central Imp. Co. et al. v. Cambria Steel Co. et al., 210 F. 696, 127 C. C. A. 184. Further, the conclusion of the trial court as to fraud is a mixed one of law and fact.

We proceed, therefore, to a somewhat extended examination of this· record, and attempt to sift from the mass of evidence the important and relative parts, assuming for said purposes that a part at least of the records and exhibits stricken by the trial court were proper evidence, a question subsequently discussed. Whether the idea of placing the naval reserve control in the Department of the Interior originated with Secretary Denby, or was suggested to him by Secretary Fall, is a matter of conjecture. It is certain that Secretary Fall was not only willing, but anxious, that such suggestion of Secretary Denby be carried out. He prepared an order for the President to sign and sent the same to Secretary Denby with a letter for him to sign and send with the proposed order to the President. This order was changed at the instance of the Navy Department, and then taken by the Assistant Secretary of the Navy to the President, who promptly signed it. Of course, this executive order must have been discussed by the President and the two Secretaries, as a matter of so great magnitude and so at variance with previous practices of the government would not have been so readily signed without previous consideration and discussion. The question of its legality was not submitted to any attorney of the Navy or Interior Department, or the Department of Justice.

While Admiral Robison represented the Secretary of the Navy and took some part in negotiations leading up to the leasing of naval reserve No. 3, he generally coincided with the views of Secretary Fall. After Robison explained them to Secretary Denby, he likewise quite generally acquiesced therein. Secretary Denby was not present at any of the conferences with Sinclair or others in regard to leasing Teapot Dome. So far as he was concerned, the idea of opening Teapot Dome as a whole had not been considered or conceived. He never met Sinclair prior to the time of the signing of the lease. His part seemed to consist merely in consenting to the plans and purposes originating with Secretary Fall. Seekers of information were all directed to Secretary Fall. The letter of Secretary Denby to Secretary Fall of October 25, 1921, shows the acceptance by the

Navy of the dominance of the Interior Department. We quote therefrom: "That all leases and contracts, except as provided in paragraph 6, will be arranged and consummated by the Interior Department; copies of same being furnished to the Navy Department as a matter of information and record only."

This arrangement was ·ratified by Secretary Fall in a letter of October 30, 1921. Secretary Denby seemed to have so little information concerning the leasing of Teapot Dome that Secretary Fall thought it necessary to writ him a long letter of date April 12, 1922, explaining the same. The evidence shows it was also explained to him by Admiral Robison before he signed the lease on April 12, 1922. No suggestions seem to have been made by him as to the lease. That Secretary Fall, as to this matter, dominated Secretary Denby, Admiral Robison, and other government officers, and practically controlled the action of the Navy Department as to the leasing of Teapot Dome, is a conclusion difficult to escape under this record. As early as July, 1921, he wrote Edward L. Doheny, referring to the Secretary of the Navy: "He understands the situation, and that I shall handle matters exactly as I think best, and will not consult with any officials of any bureau of his department, but only with himself, and such consultation will be confined strictly and entirely to matters of general policy." He originated the idea of development of fuel oil storage plants. Secretary Denby acquiesced therein. He instructed Judge Finney, Assistant Secretary of the Interior, and Director Bain to look after the negotiations for the Pearl Harbor storage project, and advised them that he would deal with naval reserve No. 3 himself. He gave orders covering even the Navy Department, forbidding the giving out of information as to negotiations for naval reserve leases. He ordered the investigation of the Pioneer and Belgo placer mining claims. Practically all the conferring and negotiating for the lease of Teapot Dome were carried on by Secretary Fall. At some of the conferences with the Sinclair interests he was the sole representative of the government. He dictated the preamble of the lease, acted for the government in settling all disputed questions, and even assumed to sign the lease on April 7th, not only for himself, but subscribed also, "and for the Secretary of the Navy." There seems to have been doubt whether it was necessary for the Secretary of the Navy

to sign at all. With the Secretary of the Interior rested the right under the lease to suspend operations temporarily under the law, to consent to a termination of the lease or an assignment thereof, and to place the value on gas and casing head gasoline. Practically all discretionary power under the lease was vested in Fall. The bond, and acceptance of Sinclair as security, seem to have been arranged by him.

April 13, 1922, he wrote President Harding, inclosing copy of reply he had sent to Senator La Follette who had requested of him copies of all executive orders relating to naval reserves 1, 2, and 3. In this he said: "Of course the matter of the process by which we are obtaining storage, etc., and the location of the storage, the contracts for the same, and in fact the plans of the Navy, as they are being worked out by myself and Secretary Denby, are military plans, and, in my judgment, should not be given to Senator La Follette or any one else." In this letter he placed himself ahead of Secretary Denby in working out the plans of the Navy. The activities of the Secretary of the Interior in taking care of affairs intrusted by Congress to the Secretary of the Navy were decidedly unusual and indicated a deep interest therein.

Shortly after Secretary Denby had acquiesced in Secretary Fall's plan as to development of fuel oil storage plans, Fall made a trip to the Pacific Coast to talk over the matter with representatives of oil companies. He returned about the middle of October, 1921. The record does not show whether or not Fall met Sinclair in the West, but it is significant that upon his return the question of drainage in Teapot Dome and the danger therefrom were again agitated. This had been considered prior thereto by some of the government officials, and a report had been made thereon by one Carroll H. Wegemann, at that time connected with the Department of the Interior. As a result of conferences it was decided to send some one to make an examination as to the question of drainage, and through the Bureau of Geological Survey one K. C. Heald was selected therefor. His report indicated no immediate danger of drainage. After this no one in the Geological Survey was further consulted on the subject. Director H. Foster Bain, of the Bureau of Mines, and also Arthur W. Ambrose, Chief Petroleum Technologist of the Bureau of Mines, likewise gave some attention to the matter. They made a trip to the West and

consulted with C. A. Fisher, a geologist, and also with Carroll H. Wegemann, who was then out of government service. After Fall's return in January from his home in New Mexico, where he was visited by Sinclair and his counsel, Col. Zevely, the drainage question was again taken up and it was concluded that it was acute. Secretary Denby, under Robison's presentation of the question, finally became convinced and agreed to the development of Teapot Dome as a whole. Robison promptly reported this to Fall.

That there was remote danger of drainage of a portion of Teapot Dome by virtue of leases in the adjacent Salt Creek field is apparent from the record. However, the evidence clearly establishes that there was no immediate danger, and no need for haste. The drainage danger was unquestionably not imminent enough to force immediate action in the leasing of the entire property. 'It was a matter of five years or more, according to some of the testimony. At no time was the oil in the first Wall Creek sand, estimated to contain between 50,000,000 and 55,000,000 barrels of oil, in danger of drainage. It was not until the full scheme of development of the entire reserve, with its attendant features, was suggested and became visualized, that these fears of drainage became acute. The drainage question is important only as bearing on the good faith of the lease. It offered an apparently valid reason for leasing the entire reserve, and was utilized in accomplishing that result.

On February 3, 1922, Sinclair and Zevely were at Secretary Fall's office. Robison was called in and requested to present the demands of the Navy in a lease of Teapot Dome. He did so, covering the question of a pipe line and of storage facilities to be constructed in exchange for royalty oil. Something was said concerning oil certificates in lieu of cash to avoid covering the cash into the Treasury of the United States. It is significant that after this meeting, and on the very same day, Sinclair submitted a complex, tentative proposition, setting forth the terms and conditions upon which he would undertake the development of Teapot Dome, and in this agreed to quiet the Pioneed and Belgo placer mining claims, which consisted of applications for leases made under the Act of February 25, 1920.

The Mammoth Oil Company, appellee herein, was incorporated on February 28, 1922, Sinclair owning the entire stock. On March 11, 1922, the Mammoth Oil Company formally applied for a lease of Teapot Dome

and tendered quitclaims of the Pioneer and Belgo claimants; they having made an optional sale to Sinclair contingent upon his obtaining the lease. During the months of March and April, 1922, representatives of large oil companies either visited or communicated with Secretary Fall for the purpose of ascertaining whether Teapot Dome would be leased. Among these companies were the Producers' & Refiners' Corporation of Wyoming, the Texas Company, and the Texas-Pacific Coal & Oil Company.

The propositions of these various companies were not comprehensive, and were more or less fragmentary and unsatisfactory; but it clearly appears that Sinclair was in a position of advantage, by reason of the assignment to him of the placer mining claims which Secretary Fall made a condition precedent to leasing. These claims had been denied by former Secretary of the Interior, Payne. The Morgan report of July 26, 1917, and the Tallman reports of January 12, 1922, and March 10, 1922, stated they had no legal basis. Judge Finney, Assistant Secretary of the Interior, had also so found, and advised Secretary Fall that the claims "had no validity and no standing." The Morgan report stated "that there are no mineral claims to any of the lands in the said naval reserve which deserve serious consideration." Secretary Fall was fully advised of the situation as to these claims, and knew they were illegal and practically dead. It was the government's business to dispose of them—not to permit them to be used as instrumentalities to prevent a "square deal." Of course, making the acquisition of these claims a prerequisite of any lease, when Sinclair either had them or was in a preferred position to secure them, was a fraud as to other bidders, and in its effect removed them from the statute of qualified applicants. Other companies desiring to bid and obtain leases on Teapot Dome were not placed on the same footing with Sinclair. They were not advised as to the full scope of the contemplated plans, and consequently were not in position to make comprehensive propositions.

It is obvious that disclosures to these companies of the entire plans relating to Teapot Dome were studiously avoided. Various statements were made to them that the department had reached no decision, that the matter would later be discussed, that they would be advised when the department was ready to act, and their attention was called to the Salt Creek field and activi-

ties there invited. There was an utter lack of good faith in the matter. Shaffer, a newspaper man of prominence, apparently received different treatment. He made claim that he was entitled to certain acreage in Teapot Dome, and filed a written application. Secretary Fall's influence with Sinclair was such that Sinclair offered, at Fall's request, to take care of Shaffer, not, however, to the full extent demanded. Just why Secretary Fall should interest himself in Shaffer's alleged claim, which had no legal basis, is not clear, but it shows the close connection between Fall and Sinclair.

While there were undoubtedly inklings that Teapot Dome might be leased, as is indicated by the inquiries from various companies, the proceedings leading up to, concurrent therewith, and subsequent to the execution of the lease, were veiled in secrecy. In October, 1921, Secretary Fall and Robison had agreed on a policy of secrecy as to the naval reserves; Robison testifying that "it was the intention that the public and Congress should not get knowledge of what was being done until it had in fact been done." He also testified: "On that day in January, Ambrose, Bain, and I discussed the difficulties with regard to the exchange of oil for storage. At that time, or some other time, we discussed the fact that Congress would undoubtedly make trouble if the matter were brought to its attention. I was quite cognizant of the fact that Congress would feel that it ought to be consulted about the disposition of those reserves; that is, Congress, or some members of Congress, rather. I know I was practically alone in insisting that, if Congress had passed a law that [gave] us definite power we would be recreant in our trust, if it was wise for us to exercise that power, if we failed to do so. My view was to be both wise and silent."

That the matter was not handled in the usual course of business in the routine of the Department of the Interior is shown by Fall's departmental order of April 13, 1922, which recited: "Memorandum: Referring to constant requests for information concerning rumors or statements as to the disposition of naval reserve oil lands: The general policy in these matters has been given publicity. In carrying out this general policy, as it is being carried out through the co-operation of the Navy Department and of the Interior Department, it is being handled by the Secretary of the Interior and the Secretary of the Navy, but not in a rou-

tine manner by either department. The consequence is that the officials of the bureaus of either department are not able to give out any information whatsoever as to the detail of any plans of any kind or character.''

This was circulated through the Interior Department and forwarded by Secretary Fall to Secretary Denby in a letter of date April 12, 1922, in which he said: ''I have instructed my office force to give out nothing of the details of any of these contracts, and to retain in a secure place the original contract with the deeds, etc., attached. This for the reason that it has been customary to file all contracts with the general files, where by inadvertence they might be subject to examination by parties not entitled to see them. I am particularly anxious that no details should be given out pending the final agreements upon the contracts for the construction of reservoir facilities in Hawaii.''

The lease itself was drawn almost exclusively in the office of Col. Zevely, the personal counsel of Sinclair, and when executed was locked in Secretary Fall's desk, with instructions that no information relative thereto be given out. Secretary Fall then departed for the West, and the key to the desk was left with Safford, his administrative assistant. When congressional agitation began relative to the lease, Secretary Fall wired Safford to notify Sinclair to furnish a security company bond. Why Sinclair's personal bond after agitation was not as good security as before agitation does not appear.

The letter of Assistant Secretary Roosevelt, relied on to explain why matters were conducted in secret, related exclusively to Pearl Harbor. The evidence negatives any idea of a military need for secrecy in the leasing of Teapot Dome. For some reason deceit was practiced as to members of Congress, both by the Navy and the Interior Departments. March 24, 1922, Admiral Robison wrote Congressman Kelley, chairman of the subcommittee of the House committee on naval affairs: ''(c) That the development of naval petroleum reserve No. 3 is to be undertaken only to protect the government against depletion of the reserve by other parties.''

At this time it was known by Robison that the entire reserve was to be leased. Senator Kendrick, whose secretary had attempted to secure information from the Interior Department on request of Leslie A.

Miller of Wyoming concerning the leasing of Teapot Dome, requested to be advised of anything that was being done. April 10, 1922, which was subsequent to the signing of the lease, Director Bain wrote to Senator Kendrick and inclosed a copy of the press memorandum of April 6, 1922, which was recited as follows: ''As yet, no definite contracts have been made along these or any other lines, for the development, use, storage, or any other purpose, in either naval reserve No. 1 or No. 2 in California, or No. 3, known as the 'Teapot Dome,' in Wyoming.''

It is evident that this memorandum received by Senator Kendrick on April 10, 1922, was not candid or truthful as to the situation on that date, and was a deliberate attempt to deceive him. Bain testified he was not at liberty to write Senator Kendrick that the Teapot Dome lease had been signed. Bain, like others involved, was under the domination and direction of Secretary Fall. A memorandum was given out by the Interior Department on April 18, 1922, for the press, explaining in a general way the leasing of Teapot Dome, but not giving the details. Representative Mondell on April 14th received a wire from former Governor Brooks of Wyoming protesting against the purported lease. He called on the Assistant Secretary of the Interior, Judge E. C. Finney, and received the impression that it was not certain that the matter of the leasing of Teapot Dome had been fully settled by an executed and delivered document, and Mondell was left with the impression that the matter had not been fully concluded. April 19th Mondell again called upon Judge Finney, and asked to see a copy of the lease of April 7, 1922. He did not succeed in seeing said lease in the office of the Secretary of the Interior, but called upon the Secretary of the Navy, where he was permitted to read it. Senator Kendrick received a copy of the lease between April 25, and April 27, 1922.

When Senator Harreld asked Secretary Denby for a transcript of naval reserve leases executed subsequent to March 14, 1921, he replied, referring to the executive order of May 31, 1921: ''Since that date the Navy Department is not in a position to give the details of leases that may have been executed.'' Letters to Representative N. J. Sinnott and Representative James McClintic from the Navy Department were scarcely more enlightening than those received by Representative Kelley. They all

14 F.(2d)—46

show an absence of frankness and a studied attempt to deceive, and keep information from, members of Congress.

Judge Finney wrote Senator La Follette with reference to the naval reserve matter that all leases were passed on by the legal staff of the Interior Department. He was accustomed to pass on leases made by the Interior Department, and he had passed on practically all leases made since occupying the position of Assistant Secretary of the Interior, the exceptions being this one and the Doheny contract as to reserve No. 1 in California. Neither the Solicitor of the Department of the Interior nor any other attorney in said department, was asked to pass on the lease. Whatever information the Solicitor had about it seems to have come from one Col. Darden.

Not only was the information apparently to be kept from members of Congress, but from the public as well. On April 6, 1922, an oil paper known as the Inland Oil Index, wired Secretary Denby, asking as to the purported leasing of Teapot Dome to the Sinclair interests. The Secretary of the Navy responded to this telegram on April 7, 1922, the very day the Secretary of the Interior signed the lease as follows:

"To Inland Oil Index, Casper, Wyo. Matters connected with development of naval petroleum reserves are being handled by the Secretary of the Interior Navy Department has made no contract for development of Teapot Dome.    Sec. Nav."

Admiral Robison admits that the department practiced deception in this, but justifies it upon the ground that the Inland Oil Index had no right to knowledge of what was being done in the department. Even as late as April 25, 1922, the Interior Department was refusing to make public the terms of the Mammoth lease, although general information had been given in the press statement of April 18, 1922.

When Mr. John C. Shaffer on April 19, 1922, wrote Judge Finney, requesting a printed copy of the lease, Judge Finney replied on April 25th as follows:

"Your letter of the 10th, requesting that I send you, if permissible, a copy of the contract between the Secretary of the Interior, the Secretary of the Navy, and the Mammoth Oil Company, relative to naval reserve, Wyoming, is received. For military reasons, it has been deemed advisable not to make the full contract public at this time, and Secretary Fall, who is out of the city, has directed me not to give out copies

of the contract at present. I inclose for your information, however, a copy of memorandum given to the press April 18; also copy of report to the Senate upon the so-called Kendrick resolution. If and when the contract is made public, we will be glad to furnish you with a copy of same."

In the transaction of public business there is no necessity for scheming, deception, or double dealing, nor, unless in well-recognized exceptional matters, for secrecy. There was no legitimate reason for such secrecy as was thrown around this transaction. Secrecy is an aid to corruption; publicity its foe. If the secrecy was not to veil an ulterior purpose, it was, at least as to Congress, to ward off any investigation until after the leasing was completed.

Sinclair, as the testimony shows, secured by this lease rights of great value in an extensive oil field, concerning which Robison testified: "I knew that for years oil men were looking with covetous eyes on that field, and I thought that, in view of the circumstances, very favorable terms ought to be secured for the development of it." Sinclair received from the Sinclair Consolidated Oil Corporation 250,000 shares of common stock in exchange for 500,500 class A shares and 1,500 class B shares of Mammoth Oil Company stock, this lease being the only asset of said company. The Sinclair Consolidated Oil Corporation stock issued in exchange had a market value of $34 a share. Sinclair, by this exchange of stock, received for approximately a one-fourth interest in the lease and contract property of the value of more than $8,000,000. The leasehold rights were evidently therefore considered by him to be of a value of at least $32,000,000. Whether these valuable rights were obtained by bribery or other corruption, it is clear that the lease was secured for Sinclair by the influence, aggressiveness, and ability exercised by Secretary Fall in his behalf, and that the entire situation was so dominated and manipulated by Secretary Fall as to make certain this result.

A company known as the Continental Trading Company, Limited, of Canada plays an important part in this case. As certain transactions with reference to the purchase of oil from the Humphreys Mexia Company and Humphreys Texas Company are connected with the affairs of this Canadian company we discuss them here. In November, 1921, A. E. Humphreys, connected with the Humphreys Mexia Company and the

Humphreys Texas Company, began negotiations with one H. M. Blackmer concerning the sale of 33,333,333 barrels of oil. After several meetings, the final one was held in New York on November 14, 1921. As to this Mr. Humphreys testifies: "After agreeing with Mr. Blackmer on the number of barrels they would purchase and the price they would pay, I called Senator Thomas into the matter. We met Mr. Blackmer and these other gentlemen in the room of Mr. Blackmer at the. Hotel Vanderbilt, and we also met at the luncheon Senator Thomas spoke about. All the parties named, Mr. O'Neil, Mr. Sinclair, Mr. Stewart, Mr. Blackmer, and Mr. Dawes, were present."

Charles S. Thomas (former United States Senator, hereinafter referred to as Senator Thomas) was counsel for Mr. Humphreys. His testimony relative to the events of November 15, 1921, is as follows: "About noon of that day I attended a lunch down at which a number of gentlemen connected with the matter were present. My recollection is that they were Col. Humphreys, R. W. Stewart, of the Standard Oil of Indiana, James O'Neil, of the Prairie Oil & Gas Company, Harry F. Sinclair, of the Sinclair Crude Oil Purchasing Company and Mr. Harry · M. Blackmer, who I think at that time was chairman of the board of the Midwest Refining Company. It may be that some others were present, but I cannot recall whether there were any others. At that time we discussed this sale of oil. The object of the meeting was to talk over the matter with respect to details of the transaction."

Col. Humphreys had, previous to the meeting, given Senator Thomas an outline of the agreement between himself and some of the gentlemen present. Senator Thomas testifies that Humphreys had agreed to sell, "and these gentlemen, or some of them, had agreed to buy, 30,000,000 barrels of oil" from the Humphreys Companies; that "they also arranged for a second contract, to be executed at the same time, to take effect upon the performance of the first, which would also be confined to one-half of the output of the wells after the 30,000,000 barrels had been paid for." It was finally agreed to make the amount 33,333,333⅓ barrels, so that the contract would be for the round sum of $50,000,-000. Details were also discussed, and it was agreed to meet the next morning at the Vanderbilt Hotel at the rooms of Mr. Harry M. Blackmer. The next morning, at the Vanderbilt Hotel meeting, Mr. Blackmer said to Senator Thomas that the vendee in the contract would be the Continental Trading Company of Canada. This was the first suggestion in the various meetings as to this company. When Senator Thomas stated that he would have to inquire something about this company, as it was a foreign corporation, the statement was made, presumably by Mr. O'Neil, that the Prairie Oil & Gas Company and the Sinclair Crude Oil Companies were to guarantee the performance of the contract. This appeared to be satisfactory, and the first draft of the agreement was prepared by Senator Thomas. Mr. Blackmer said the president of the Canadian company would be present the next morning to sign the contract for that company.

The oil to be delivered under the first contract was to be paid for at the rate of $1.50 per barrel. The second contract was between the Humphreys Mexia Company and the Humphreys Texas Company, vendors, and the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company, vendees. As to this it was agreed the purchase should be at the prevailing rate for crude oil at the time of delivery. The parties again being present the contracts were executed November 17, 1921. Osler signed as president of the Continental Trading Company, Limited. Stewart, Sinclair, O'Neil, Blackmer, and Humphreys were present. The first contract was guaranteed as to its performance by the Prairie Oil & Gas Company, signing by J. E. O'Neil, president, and the Sinclair Crude Oil Purchasing Company, signing by H. F. Sinclair and R. W. Stewart. The second contract providing for the purchase of the oil at the posted field prices was executed on behalf of the Sinclair Crude Oil Purchasing Company, by Harry F. Sinclair and R. W. Stewart for the directors. While not directors, they represented the interests controlling that company. A third contract was also entered into on November 17, 1921, between the Continental Trading Company, Limited, vendor, and the Prairie Oil & Gas Company and the Sinclair Crude Oil Purchasing Company, as vendees, whereby the vendees agreed to purchase the said 33,333,333 barrels of crude petroleum sold by the Humphreys Company to the Continental Trading Company, Limited, and to pay therefor $1.75 per barrel.

The two purchasing companies in this contract assumed the obligations of the Continental Trading Company, Limited, under its contract with Humphreys. The contract of purchase between Humphreys and the Continental Trading Company, Limited, called for payment on the 15th of each month for oil run in the previous month. The repur-

chase contract of the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company called for settlement with the Continental Trading Company, Limited, for the same oil by the 10th of each month. Hence the Continental Trading Company was provided with a system by which it would have the money to pay its obligations to Humphreys five days before they fell due, and it had a clear profit of 25 cents per barrel. It does not appear why the sale from the Humphreys Company was not made directly to the Prairie Oil & Gas Company and the Sinclair Crude Oil Purchasing Company. It is apparent that there was a handsome profit for some one, presumably the Continental Trading Company, Limited, in this peculiar transaction.

A large part of the profits, if not all, of the Continental Trading Company, Limited, under its resale contract of November 17, 1921, were invested by Mr. Osler in the purchase of United States Liberty first 3½ per cent. bonds. April 11, 1922, as president of this company he requested the Dominion Bank Agency in New York City to purchase $300,000 of such bonds. Osler in his testimony claims to have no recollection of this. The evidence shows that these bonds were purchased from various New York brokers; April 13, 1922, $100,000 of them from Salomon Bros. & Hutzler, of New York City. On the same date $100,000 worth, under the respective numbers that appear in the record, were purchased by the Dominion Bank Branch Agency from Walker Bros., of New York City. On April 17, 1922, $50,000 more were purchased from Walker Bros. by the same agency. These bonds were delivered on May 8, 1922, by the Dominion Bank Branch Agency to Mr. Osler as president of the Continental Trading Company, Limited. The Continental Trading Company, Limited, purchased between February 15, 1922, and June 13, 1922, approximately $3,000,000 of United States Liberty first 3½ per cent. bonds, necessarily out of the profits in the resale of the Humphreys purchases, which comprised the only business of this company.

May 26, 1923, an agreement was executed whereby the Continental Trading Company, Limited, assigned its contract of November 17, 1921, with the Humphreys interests to the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company. At that time some 8,000,000 barrels of oil had been delivered under the Humphreys contract of November 17, 1921, leaving some 25,000,000 barrels still to be delivered to the Continental Trading Company, Limited. As this oil had been resold to the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company on the same date at a profit of 25 cents per barrel, there was still a profit to accrue to the Continental Trading Company, Limited, of some $6,000,000 under its resale contract. Phillips, president of the Sinclair Crude Oil Purchasing Company, testifies that he understood the consideration for the assignment of the resale contract was $400,000. Shortly after this, viz. August 9, 1923, the Continental Trading Company, Limited, wound up its affairs and went out of business. Its books were destroyed. Its work was finished.

Mr. M. T. Everhart, son-in-law of Secretary Fall, on May 29, 1922, appeared at the First National Bank of Pueblo, Colo., where he handed to an employé of that bank, L. T. Rule, $90,000 of United States Liberty first 3½ per cent. bonds, with the statement that they were the property of Secretary Fall, and were to be kept by the bank for Mr. Fall's account. On the same day Everhart delivered to the M. D. Thatcher Estate Company $140,500 of United States Liberty first 3½ per cent. bonds. $200,000 of these bonds are identified in the record, by comparing the coupon numbers thereof, as bonds purchased and delivered a short time before to Mr. Osler as president of the Continental Trading Company, Limited. The entire lot of $90,000 of United States Liberty first 3½ per cent. bonds were identified by the coupon numbers as bonds purchased for and coming into the possession of the Continental Trading Company, Limited. About $20,000 of the $90,000 of bonds were deposited in the First National Bank of El Paso to the credit of Secretary Fall in October and November, 1922. The numbers of the bonds noted on the deposit tickets identified $5,000 of them as coming out of the lot purchased from Salomon Bros. & Hutzler by the Dominion Branch Bank for the Continental Trading Company, Limited, and $15,000 from those purchased from Rhoades & Co. $20,000 of the $90,000 lot of bonds were deposited to the credit of the Tres Ritos Cattle & Land Company in the First National Bank of Pueblo, Colo., on October 23, 1922. The capital stock of this company was owned, one-half by Fall and one-half by Everhart. These bonds were identified, $4,000 of them being bonds purchased from Rhoades & Co., and $16,000 of them being bonds purchased from Salomon Bros. & Hutzler, for the Continental Trading Company, Limited. The balance of this lot of bonds were deposited with the Exchange Bank of Carrizozo, N. M., to the

credit of Secretary Fall on March 29, 1923. $25,000 of said bonds came from the Salomon Bros. & Hutzler purchase, and $25,000 from the Rhoades & Co. purchase.

The $140,500 of bonds delivered to the M. D. Thatcher Estate Company by Everhart were sold, and part of the proceeds used to liquidate the indebtedness of Fall, Everhart,. and the Tres Ritos Cattle & Land Company (of which company Fall and Everhart were the owners) to the said M. D. Thatcher Estate Company. The balance was turned over to Fall and Everhart. $106,000 of these bonds were identified, $100,000 as coming from the purchase from Walker Bros. and $6,000 from the purchase of Rhoades & Co. by the Dominion Branch Bank Agency in New York for the Continental Trading Company, Limited. The remainder of the bonds were not identified. There is no direct evidence as to how these bonds got into the possession of Secretary. Fall's son-in-law and agent, Everhart. Mr. Everhart was placed upon the stand and refused to answer questions on the ground of self-incrimination. He refused to say whether he was in the eastern part of the United States in May, 1922, and stated as to the Liberty Bonds in his possession that he was interested as a principal therein. His claimed privilege was sustained by the court.

Appellant, in its attempts to show the facts as to the organization and business operations of the Continental Trading Company, Limited, was confronted with obstacles most difficult, and in some instances impossible, to overcome. This company was organized in November, 1921, under the laws of Canada, and is a somewhat unique and peculiar institution. Coupon share warrants, transferable by delivery, were issued, as was permissible under the Canadian law, instead of certificates of stock. It had no list of stockholders or stock warrant holders, and nothing to show who the stockholders were. It is reasonable to conclude from the record that those chiefly interested in its formation and short existence were citizens of the United States who, for some reason, preferred Canadian corporation laws to those of their own country. The reason for the organization of the corporation under the laws of Canada is not disclosed. The president and counsel of this company, Mr. Henry Smith Osler, a barrister of Toronto, Canada, who controlled and spoke for the other officers, who are clerks in his office, refused to reveal anything of

importance when the effort was made to take his evidence in Canada. He refused to divulge any facts that would materially assist the government, on the plea that the acts done by him with reference to the organization and carrying on of the business of the Continental Trading Company, Limited, were privileged as matters between attorney and client. He presented a carefully prepared statement as to what he thought he could properly testify to concerning the transaction. He testified he had a trifling interest in the company; "the officials being all members or employees of my firm, and the company being in effect merely a corporate clerk in my office. The business of the company was conducted consistently with this position. No director, clerk, official, or officer of the company outside my office was ever appointed, and I remained in entire charge of the matter as effectively as if no company had ever been formed." A client, whose name Osler refused to disclose in his evidence, met him in New York in connection with the purchase of the 33,000,000 barrels of oil from the Humphreys interests, and its resale to the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company, at an advance of 25 cents per barrel.

According to Osler's abortive testimony, the unnamed client enjoined him not to disclose under any circumstances his identity. Osler claimed that he did not know who the stockholders of the company of which he was president were. He was told by the gentleman who first talked with him about the Humphreys matter whose name he would not give, as it was given to him in confidence, that he had associates who were interested with him in the matter, but that he must not disclose their names. According to him, "they then, according to my understanding, became my clients." No meetings of the shareholders of this phantom company were ever held for business purposes. The only meetings held were those required by law in connection with the organization and termination of the company. Osler claimed that everything that was done by the company, of which he admits in the statement he might have been, or acted as, president, and which was "in effect merely a corporate clerk in my office," was done under instructions from the unnamed client. Under the claim of privilege as to communications between client and attorney, he refused to disclose whether Sinclair was present at any conferences, what dividends were

declared by the company, whether any Liberty Bonds were received by him as president and distributed to shareholders as dividends or division of assets, whether he brought any such bonds to Toronto to make distribution, whether he paid his contribution to the capital stock of the Continental Trading Company, Limited, in cash, whether he personally handled the final distribution of the assets of the company, whether he distributed these assets to persons who then held stock or share warrants, or whether he had at any time delivered any United States Liberty Bonds to Sinclair, or any one known by him to be acting for him. His claim of privilege was extended to cover the entire course of business of the company.

A reading of this remarkable and evasive testimony impresses the fact that Osler was attempting, though president of this company, to conceal the entire transactions leading to its organization and the carrying on of its business. It is an attempt to carry the doctrine of privileged communication beyond the bounds of reason or common sense, and is trifling with the processes of the courts and making a travesty of a great fundamental principle of law. If a corporation can be organized, as this was, to transact certain business, and the president of the corporation can refuse to disclose the business operations thereof, and if the corporation can be protected because it is organized as a result of some confidential communication to the organizer by those who do the organizing, then a new and unheard of use of corporations has been established. The whole scheme of forming the Continental Trading Company, Limited, and the carrying on of its business is open to grave suspicion, added to by the method in which it was officered, the evasive testimony of its president, and his claim of privilege as to matters clearly without the scope thereof. If its object was to preserve secrecy as to the Humphreys transaction, to assist in the scheme of those concerned therein to make a profit at the expense of their stockholders and bury all trace thereof, or if it bore relationship in any way to matters involved in the acquisition of the lease in suit and the same secrecy was desired, certainly a wise choice was exercised in the selection of Osler, whose right hand, under his control as president, was not permitted to know what his left hand, under his control as counsel, was doing.

[21] The highest court of Canada has held that Osler is compelled to answer many of the questions propounded to him by counsel for the United States. The decision was rendered during the trial of this case in the District Court. The government sought to have the case reopened after the decision of the trial court, and before judgment, in order to obtain this evidence. Its motion directed to this was denied. In our judgment it should have been granted.

An attempt was made by the United States to take the deposition on letters rogatory of Henry (or Harry) Blackmer, his temporary address at that time being Paris, although his home was in Denver, Colo. He did not know, as testified to by him, when he expected to return to the United States, and refused to answer whether he had any official connection with the Midwest Refining Company and stated that, as he had "done nothing contrary to law, honor, or morality, directly or indirectly," he refused to reply to the questions put to him. He would not answer as to his knowledge concerning the Continental Trading Company, Limited; whether he had been connected with that company; whether he knew Osler; whether he ever had any stock warrants representing the stock of the Continental Trading Company, Limited; whether he was acquainted with Sinclair; whether he was present at the meeting at Hotel Vanderbilt during the time of negotiations as to the Humphreys contract; whether he had ever received any United States Liberty $3\frac{1}{2}$ per cent. bonds as dividends or profits arising from the Continental Trading Company, Limited; whether Harry F. Sinclair to his knowledge had any interest, as officer, director, or owner of stock warrants of the Continental Trading Company, Limited, of Canada during the year 1922; whether he knew anything as to the transaction between that company and the Humphreys Mexia Company and the Humphreys Texas Company.

James E. O'Neil, who the testimony shows was present as a representative of the Prairie Oil & Gas Company at the time of the negotiations and the execution of the contracts of November 17, 1921, and whose address was Garden City, New York, also seems to have been temporarily residing in France at the Villa St. Antonio, Cannes, immediately prior to the time of the trial when the government desired to secure his evidence. He did not know when he expected to return to the United States. He also affirmed that he had done no illegal act, or anything contrary to morals, relative to this

affair; that his health was not good, and that he preferred to remain away from the proceedings in suit, and refused to answer interrogatories propounded in the attempt to secure his evidence. The same amount of information was obtained from him as from Blackmer.

The trial court, in speaking of Blackmer's refusal to testify, says: "Being an officer of the Midwest Refining Company, he may not have desired to testify in regard to the details of the transaction, for the reason that it might be thought by his company that he should be held accountable for the profits derived in his brokerage transactions, or he may have been desirous of avoiding income taxes, or his refusal may have been based upon the ground that, as there was no connection between his transaction and the Mammoth lease, it was not the concern of other people in their investigation of an entirely different and disconnected transaction. In the realm of speculation, we may allow our imaginations to roam at will. Stewart and O'Neil did not testify, although it appears that Stewart might have been available."

That gentlemen, who had occupied such responsible positions in great oil companies as Mr. Blackmer and Mr. O'Neil had, should leave their country and refuse to answer questions put to them by counsel for their own government in the attempt to elicit information which might bear even somewhat remotely on the charge that a cabinet officer had accepted a bribe, naturally challenges attention. We think it cannot be said that the transactions inquired about could have had no possible connection with the subsequently executed lease to the Mammoth Oil Company then undoubtedly under consideration and negotiation. At least the government contended it did have, and there is some basis in the evidence for such contention. The entire transaction of the purchase of the Humphreys oils by the Continental Trading Company, Limited, and the resale to the Prairie Oil & Gas Company and the Sinclair Crude Oil Purchasing Company bears the earmarks, either of a swindle of the stockholders of these companies, which, of course, is not a question before us, or a scheme to create a fund to be used in the way the government claims the profits of the Continental Trading Company, Limited, were in part used, viz. for a sinister and unlawful purpose, or both. The record throws little light on the purposes of this most peculiar transaction, and the parties who could explain the same seem to be either conveniently absent from the country or strangely and eloquently silent. Mr. Stewart, who was present at the Humphreys negotiations, it was stated by counsel for the government in the trial of the case, was under subpoena, but the same counsel stated in his oral argument in this court that his statement to the trial court was a mistake. Counsel for the United States in their brief say: "A subpoena was issued for Mr. Stewart, but the marshal was never successful in serving him. During the trial he was in Mexico and South America." The residential status of Mr. Stewart is a matter of some doubt under statements of counsel here and in the trial.

The trial court in its opinion refers to some of the circumstances in the case as suspicious, but finds there are missing links in the testimony, which are supposedly the connection of Sinclair with the Continental Trading Company, Limited, and with the acquisition of Liberty Bonds by Everhart, used for his and Secretary Fall's credit. There is not sufficient direct evidence in this record to show these matters. The really determinative question therefore as to this branch of the case is: Are the reasonable inferences and presumptions legitimately and properly to be drawn from all the facts and circumstances disclosed in the evidence sufficient to supply the so-called missing link?

In this connection we revert to some matters previously discussed. As before pointed out, Sinclair received through Secretary Fall's efforts and unfair manipulations a lease of great value. That there existed a somewhat intimate relationship between Secretary Fall and Sinclair is apparent. Sinclair visited Fall at his ranch in New Mexico and talked over the matter of the leasing of Teapot Dome. Sinclair's personal attorney drew the lease. Sinclair, at Secretary Fall's suggestion, after the lease was executed, arranged for a prominent newspaper publisher, Mr. Shaffer, to have some 400 acres of the Teapot Dome lands.

On May 26, 1923, Fall, then shortly out of the office of Secretary of the Interior, was presumably employed by Sinclair to make a trip to Europe for Sinclair for the claimed purpose of acting as counsel for Sinclair as to any international questions that might arise in his attempt to secure leases in Russia. Secretary Fall suggested to Zevely, who appears to have been managing the matter, that he desired the approval of the adminis-

tration as to this enterprise. It is not disclosed that the same was ever sought. Assuredly it was not forthcoming. Fall informed Zevely that he needed $25,000 with which to buy some ranches. Zevely conveyed the information to Sinclair that Fall might want that amount, and Sinclair said: "If he does, you will have to let him have it." Why he would have to let him have it is not explained. After Sinclair had sailed for Europe, having directed his secretary, Wahlberg, to turn over to Zevely $25,000 in bonds, if Zevely asked for it, Zevely requested bonds, and Wahlberg turned over to him $25,000 face value 3½ per cent. United States Liberty Bonds, which he in turn gave to Fall.

There is no identification of these bonds as being bonds ever owned by the Continental Trading Company, Limited, although they are 3½ per cent. Liberty Bonds, and in that respect bear similarity to the bonds received by Everhart about a year before these were taken from Sinclair's box. They were forwarded by Fall to the First National Bank of El Paso, with directions to sell and credit to his account. Fall also received $10,000 for expense money. The testimony shows that Fall did not buy the ranches, for which purpose he had supposedly received the $25,000. Zevely testifies that these bonds were a loan from Sinclair to Fall, and not a fee, and that after his return from Europe Fall gave him his note for the amount. There is no testimony to show that any interest or principal was ever paid thereon. The proceeds of the sale of these Liberty Bonds were credited to Fall's account. Zevely's explanation of this affair is weak, wholly unsatisfactory, and evidently born of the exigencies of the situation.

[22] Barring discussion of the impropriety of a cabinet officer, who had turned over leasehold interests of immeasurable value accepting employment from the beneficiary thereof within a few months after his retirement from office, the transaction tends to show that the dealing in bonds between Sinclair and Secretary Fall was not a novel affair, unusual as it might be in the business world, and reveals an intimate relationship between Secretary Fall and Sinclair. A contract made by a public official, with a corporation or firm from which he accepts employment immediately upon retiring from office, should be closely scrutinized by the courts. It relates back and tends to taint the contract, perhaps not in itself sufficiently to invalidate it, but is to be considered as a

weighty circumstance bearing on the good faith of the matter. This transaction as to the $25,000 of Liberty Bonds passing from Sinclair to Secretary Fall, although occurring after Fall had retired from office, blends into past events and becomes in fact an important feature in this case.

The trial court was of the opinion that the testimony of Humphreys and Senator Thomas disclosed that "Osler and the Continental Trading Company, Limited, were the creatures of Blackmer," that Blackmer was the unnamed client of Osler, and that therefore there was no connection between Sinclair and Fall in the transaction as to the bonds appearing in the hands of Everhart except by suspicion or guess. Appellees argue that the evidence shows Sinclair was not the client of Osler and had no connection with the Continental Trading Company, Limited. While it is true that Blackmer carried on the preliminary and final negotiations for the purchase of the Humphreys oils, the testimony of Thomas and of Humphreys shows that Blackmer was acting for other gentlemen as well as for himself. Under the contract entered into between the Continental Trading Company, Limited, and the Humphreys Companies, the Continental Trading Company, Limited, was quite sure to make a profit of approximately $8,000,000 if it kept the contract. This was surely not all for Blackmer. The other gentlemen sitting around the New York luncheon table, with the exception of Humphreys and Senator Thomas, were also engaged in this piece of high finance. Senator Thomas testifies, as before pointed out, that "these gentlemen, or some of them, had agreed to buy." Osler speaks in his testimony of the associates of Blackmer.

On account of Blackmer's sojourn abroad, the court is not permitted to know his version of the matter, but it is clear from such evidence as the court is permitted to have on this question that Blackmer was not acting for himself alone, but for others, and that the others were the gentlemen meeting at New York at the time the various contracts were made, one of whom was Sinclair. He was present with the other gentlemen when the Humphreys matters were discussed, and when the negotiations were concluded and contracts signed. Is it reasonable to suppose that the guaranty of the Humphreys contract, made by Sinclair and Stewart, acting for the Sinclair Crude Oil Purchasing Company, would be made, unless Sinclair had something to say as to the affairs of the Con-

tinental Trading Company, Limited? Would he participate in an arrangement by which the stockholders of the company he represented would be mulcted to the extent of 25 cents per barrel of oil unless he were participating in the profits thereof? Surely here is something laid at the door of Sinclair requiring explanation. It is no answer to say it relates to a matter not in this case. The Continental Trading Company, Limited, and its affairs occupy an important position in this case not eliminated by the evasiveness of its president. Is it reasonable to suppose that the sale to the Sinclair Crude Oil Purchasing Company and the Prairie Oil & Gas Company by the Continental Trading Company, Limited, of the Humphreys contract, in which there remained a profit of approximately $6,000,000, for $400,000 would have been made unless the Sinclair Crude Oil Purchasing Company or its officers were connected with and influential with said Continental Trading Company, Limited? It is apparent, we think, that this Continental Trading Company, Limited, was merely the agency of some of the gentlemen who sat around the luncheon table in New York negotiating for the purchase of the Humphreys oil, and was to do as a corporation what these gentlemen were evidently not willing to undertake as principals. It was nothing more than a dummy corporation, and courts will look through the shell of such an institution to see what it really is.

The silence and evasions in this suit suggest many pertinent inquiries. Why should Osler refuse to disclose the connection, if any, of Sinclair with this company? Why is silence the answer of a former cabinet official to the charge of corruption? Why is silence the only reply of Sinclair, a man of large business affairs, to the charge of bribing an official of his government? Why is the plea of self-incrimination—one not resorted to by honest men—the refuge of Fall's son-in-law, Everhart? It would seem that men of standing in the business world when accused of being bribers, would be quick to resent the charge, and eager to furnish all information possible that might remove such stain upon their reputations. It is incredible that a former cabinet official, in the position of trustee of the public lands for the people of the United States, when accused of bribery and corruption in connection with his official duty in matters where great public interests are concerned, would not be quick to refute the same. Men with honest motives and purposes do not remain silent when their honor is assailed. It is

amazing that officers of great oil companies, such as Blackmer and O'Neil, would flee their country and refuse to testify in a suit brought by their own government to unearth an alleged fraud practiced on it by a high official. While Secretary Fall is not technically a party to this suit, he was the agent for the government in the transactions provocative of this case, and his former principal is a party. Sinclair is in fact a party because the Mammoth Oil Company is his creation and agent. Its acts are his acts.

Is a court compelled to close its eyes to these circumstances? Is it to assist by nice technicalities and legal blindness a transaction such as the government charges took place, and such breach of trust as the evidence in this case points unerringly to if not to absolute criminality? These gentlemen have the right to remain silent, to evade, to refuse to furnish information, and thus to defy the government to prove its case; but a court of equity has the right to draw reasonable and proper inferences from all the circumstances in the case, and especially from the silence of Secretary Fall and from the failure of Sinclair to testify. It is not sufficient answer that the government might have used Sinclair as a witness. He was properly a witness for the defense. If he could not fully have explained the organization of the Continental Trading Company, Limited, he could at least have placed beyond the realm of dispute the question of whether he was connected therewith, and whether he received any government bonds as dividends therefrom, or shared in any distribution of its assets.

The trial court said: "The entire transaction, in so far as it was participated in by Sinclair, was fully revealed by other witnesses, and presumably, if we are to presume anything on account of the failure of Sinclair to testify, if he elected to so testify, his testimony would have been to the effect that he knew nothing further in regard to the Continental Trading Company transaction than was disclosed by the other witnesses in the case. A different situation might have been presented, had Blackmer been in the place of Sinclair, if we are to consider as admissible the evidence in regard to bonds purchased by the Continental Trading Company and subsequently finding their way into the possession of Fall's relative. For aught we know, there may have been independent business relationships, legitimate or otherwise, between Blackmer and Fall, as neither is made a party to this suit."

[23] We do not reach the same conclusion

under the record. We fail to perceive why, under all the circumstances revealed in this case, it should be presumed that Sinclair knew nothing more than the other witnesses who testified as to the organization and business of the Continental Trading Company, Limited. Two of the witnesses familiar therewith were in France. The president of the company refused to disclose any facts of importance as to its business. Whether Stewart was available is a matter of doubt. With important and controlling facts in Sinclair's possession, and with a train of circumstances that aroused the gravest suspicion as to corruption practiced in securing the lease laid at his door, his failure to testify is a matter of deep significance. There is a presumption in the law that, if a litigant have facts within his knowledge and refuses to reveal them, it is presumed that if revealed they would be against him. The silence of one who should speak may well create an inference adverse to him.

In Gulf, C. & S. F. Ry. Co. v. Ellis, 54 F. 481, 483, 4 C. C. A. 454, 456, this court said: "The facts in the matter in dispute rested peculiarly within the knowledge of the defendant, and it had in its power to show, by its engineer, what they were, and declined to do so. Now, it is a well-settled rule of evidence that, when the circumstances in proof tend to fix a liability on a party who has it in his power to offer evidence of all the facts as they existed, and rebut the inferences which the circumstances in proof tend to establish, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would support, the inferences against him, and the jury is justified in acting upon that conclusion."

In Kirby v. Tallmadge, 160 U. S. 379, 16 S. Ct. 349, 40 L. Ed. 463, the court, referring to the failure of the defendants to introduce any witnesses, said: "As they had it in their power to explain the suspicious circumstances connected with the transaction, we regard their failure to do so as a proper subject of comment. * * * It would certainly have been much more satisfactory if the defendants, who must have been acquainted with all the facts and circumstances attending this somewhat singular transaction, had gone upon the stand and given their version of the facts."

In Starkie on Evidence, vol. 1, p. 54, it is said: "The conduct of the party, in omitting to produce that evidence in elucidation of the subject-matter in dispute, which is within his power, and which rests peculiarly within his own knowledge, frequently affords occasion for presumptions against him, since it raises strong suspicion that such evidence, if adduced, would operate to his prejudice." See, also, Bilokumsky v. Tod, 263 U. S. 149, 44 S. Ct. 54, 68 L. Ed. 221; Choctaw & M. R. Co. v. Newton, 140 F. 225, 71 C. C. A. 655; Hill v. United States, 234 F. 39, 148 C. C. A. 55; Attorney General v. Pelletier, 240 Mass. 264, 134 N. E. 407.

The statement of Lord Mansfield in Blatch v. Archer, Cowp. 63, 65, is apropos: "It is certainly a maxim that all evidence is to be weighed according to the proof which it was in the power of one side to have produced, and in the power of the other side to have contradicted."

[24] Of course, a plaintiff in a case cannot insist that defendant must furnish evidence he may have or permit plaintiff to succeed, and there must be affirmative proof of facts prima facie at least to sustain plaintiff's contentions before inferences can be properly drawn. The language used by some courts is that there must be something laid at defendant's door. As before indicated, we are of the opinion that that situation existed here.

None other beside Sinclair in the company of men sitting around the table and arranging the Humphreys deal had any connection with Secretary Fall, either at that time or in the future, so far as the record shows. While this was prior to the signing of the lease, it is reasonably certain that negotiations were then either being carried on with reference thereto, or were in immediate prospect. From all the circumstances, especially in view of his failure to testify and explain the formation of this corporation or to deny his connection therewith, the reasonable inference is that Sinclair was one of the principals and shared in the profits of this transaction.

We then have a situation where an agency of Sinclair and others, the Continental Trading Company, Limited, had as a part of its assets some of the very Liberty Bonds which soon after their acquisition by said agency appeared in the hands of Fall's son-in-law, and were deposited to Fall's credit in banks and used to liquidate his debts. There is no direct evidence to show how the bonds of the Continental Trading Company, Limited, came into Everhart's possession. Everhart took refuge in a plea of self-incrimination. Osler refused to explain under plea of privilege as an attorney. Sinclair remained silent; likewise Fall. If Blackmer and O'Neil know anything about it, their evidence can-

not be procured until their sojourn in a foreign country is ended. This company during its short life had purchased a large amount of Liberty Bonds, and out of its profits in the Humphreys matter, before the bonds appeared in Everhart's hands, it had purchased at least $300,000 of such bonds. At the time the company surrendered its charter in 1923, Osler reported to the proper officer that the assets had been divided ratably among those entitled thereto.

What became of these bonds? The government claims they were distributed by Osler, as dividends or as assets, to the holders of coupon share warrants of the Continental Trading Company, Limited. It would be quite natural that a company with so little expense, its officers being mere clerks in Osler's office, and making so much money out of the purchase and resale of the Humphreys oils, and making it so easily, would distribute dividends to its shareholders. While Osler refused to answer what he did with Liberty Bonds received by him as president of the company, refused to testify in what commodity the dividends were paid, and whether he distributed to warrant holders on or about May 8, 1922, certain Liberty Bonds, he did say: "As I say, speaking from recollection, I would say I didn't get any bonds to deal with for eight or ten months; but I am wrong about that apparently. I have no recollection what I may have done with them. My recollection is quite blank at that time altogether. I cannot give you any other thing I would have done with them, except distribute them to the stockholders. You are asking me to guess. My memory is not refreshed on the subject."

In view of this testimony, evasive and noncommittal as it is, taken in connection with the statement in Osler's letter of August 9, 1923, to the under secretary of state at Ottawa, Ontario, that the Continental Trading Company, Limited, had "divided its assets ratably amongst its shareholders," it is fair to assume that the warrant shareholders received dividends and assets in the form of government bonds, as the bonds purchased constituted the only assets of the company shown by the record. More than $200,000 of these assets in the form of Liberty Bonds had either been sold by May, 1922, and purchased by Everhart, or had reached him in other ways. If he had purchased them on the market there would be no reason for him to claim that testimony so showing would incriminate him, nor would there have been reason for Osler to evade testimony on this

question. It is a reasonable and proper inference under these circumstances that Everhart did not receive the bonds through purchase.

While no isolated fact, circumstance, or presumption in the case and no particular inference may be sufficient to establish Sinclair's connection with the receipt of bonds by Fall or Everhart, yet, taking the entire record of what was done, and all the inferences properly to be drawn therefrom, the fact is sufficiently established that the bonds in the possession of Everhart and used in part for Secretary Fall's benefit were received by Everhart either from Sinclair or the Continental Trading Company, Limited. That company, we have pointed out, is shown to have been the agent of Sinclair, Blackmer, O'Neil and Stewart. Its assets consisted principally of Liberty Bonds. These assets were delivered to the shareholders, as Osler's letter shows. If by direct evidence it appeared that Sinclair was the owner of certain Liberty Bonds, which afterwards appeared in Secretary Fall's hands, in view of all the circumstances of this case, a court could not escape the conclusion that Sinclair had transferred them to Fall. The only difference here is that the bonds were the property of an agency in which Sinclair was interested, and in some manner reached Everhart and Secretary Fall.

Is a court to say that, because none testified as to the actual transfer of the bonds, a fatal missing link in the evidence exists. We conclude not. The reasonable, proper, and natural inferences and presumptions from the accrual of condemnatory incidents appearing in this record supply the so-called missing links in the testimony and satisfy us of Sinclair's connection with the Continental Trading Company, Limited, and with the acquisition of the government Liberty Bonds by Everhart and Secretary Fall. A trail of deceit, falsehood, subterfuge, bad faith, and corruption, at times indistinct, but nevertheless discernible, runs through the transactions incident to and surrounding the making of this lease. It should not receive the approval of the courts. Our conclusion is that the government has sustained its claim that the lease and contract were procured by fraud and corruption, and that they should be canceled. This conclusion is based on the theory that a part of the evidence, at least as to the purchase of the bonds and the identification of those coming into the hands of Everhart, was competent. This question next demands our attention.

## IV. Action of the Trial Judge in Sustaining Motion To Strike Certain Testimony.

[25] Appellees at the conclusion of the testimony moved to strike from the record the items of deposit, deposit tickets, checks, book entries, ledger entries, and other records and papers of the Exchange Bank of Carrizozo, N. M., the First National Bank of El Paso, Tex., the Federal Reserve Bank of Kansas City, the Central Union Trust Company of New York, the M. D. Thatcher Estate Company, the Dominion Bank of Canada, New York Agency, Salomon Bros. & Hutzler, Walker Bros., Rhoades & Co., and the First National Bank of Pueblo, Colo.

The motion was based on two grounds, viz.: (1) That some of the evidence was hearsay, the parties who purported to testify having no personal knowledge of the books and records themselves. (2) That the evidence fell within the rule of "res inter alios acta."

The court held that the first ground urged affected only a small portion of the evidence, and refused to sustain the motion on that ground. As to many of the transactions, the persons who actually conducted the same testified as to the entries. Others refreshed their recollection and testified from memory as to some of the original transactions. Practically all the records sought to be introduced were original records, and were identified by persons having custody thereof, and under whose supervision they had been made. The entries therein were regularly made in connection with the due course of daily business of the companies. In some instances it was impossible to secure the attendance of the particular person making some particular entry, he being no longer in the employ of the firms or corporations. While there may be some hearsay, as the court found, it affects only a small portion of the evidence, if at all. A large part, at least, of the evidence of records and exhibits was admissible. Billingsley v. United States (C. C. A.) 274 F. 86; Templar Motors Co. v. Bay State Pump Co. (C. C. A.) 289 F. 24; Robilio v. United States (C. C. A.) 291 F. 975; Wilkes v. United States (C. C. A.) 291 F. 988; Grunberg v. United States, 145 F. 81, 76 C. C. A. 51; Reyburn v. Queen City Savings Bank & Trust Co., 171 F. 609, 96 C. C. A. 373; The Spica (C. C. A.) 289 F. 436; E. I. Du Pont Co. v. Tomlinson (C. C. A.) 296 F. 634; Wisconsin Steel Co. v. Maryland Steel Co., 203 F. 403, 121 C. C. A. 507; Mississippi River Logging Co. v. Robson, 69 F. 773, 16 C. C. A. 400; Farmers' Nat. Bank v. Pratt, 193 Iowa, 406, 186 N. W. 924; Roberts v. Ozias, 179 Iowa, 1141, 162 N. W. 584; Shirley v. S. Ry. Co., 198 Ala. 102, 73 So. 430; People v. McCann, 247 Ill. 130, 93 N. E. 100, 20 Ann. Cas. 496; Wigmore on Evidence, vol. 2, § 1530; Hughes on Evidence, p. 177, § 3.

If enough of such evidence was competent, as we conclude it was, to establish that some of the Liberty Bonds purchased by the Continental Trading Company, Limited, found their way into Fall's or his son-in-law's possession, it would be of little consequence in the final determination of the case whether or not any other of such bonds were likewise traced. This court in Union Pacific R. Co. v. Perrine (C. C. A.) 267 F. 657, and in Crowell Bros. v. Panhandle Grain and Elevator Co. (C. C. A.) 271 F. 129, strongly condemns hearsay testimony. Our holding here is no relaxation of the rules there announced. The records there clearly show the challenged evidence was hearsay. Such situation is not presented here as to most of the evidence objected to. As to a small part thereof the preliminary proof may not have been sufficient.

[26] The court based its action in sustaining the motion to strike on the ground that the rule "res inter alios acta" applied to and governed the situation. The ruling would seem to be entirely unimportant, for the reason that if this evidence, conceding it to be admissible in connection with the other evidence in the case, was insufficient to sustain the charge of fraud, then the question of whether it was properly admitted, was of no consequence. If, however, the transactions as to the purchase of the government Liberty Bonds was a part of or resulted from a conspiracy between Fall and Sinclair to corruptly bring about the execution of the lease they were not matters between strangers and the evidence relating thereto would not be subject to the rule of "res inter alios acta."

Appellee Mammoth Oil Company being the creature of Sinclair, its acts being his acts, it could not well be claimed that the purchase or deposit of the government Liberty Bonds bore no relationship to the parties to this case, if the whole matter was part of or the result of a conspiracy by which Secretary Fall or his agent received from the agent of Sinclair the Liberty Bonds for negotiating the very lease and contract which this suit was brought to cancel. New York Mutual Life Ins. Co. v. Armstrong, 117 U. S. 591, 6 S. Ct. 877, 29 L. Ed. 997; Olson v.

United States, 133 F. 849, 67 C. C. A. 21; Knudsen v. Domestic Utilities Mfg. Co. (C. C. A.) 264 F. 470. The bond transactions were evidence bearing on the question of improper motives on the part of Secretary Fall in negotiating the lease and contract.

The facts considered by this court in Board of Commissioners v. Keene Five Cents Sav. Bank, 108 F. 505, 47 C. C. A. 464, in which reference is made to the rule of "res inter alios acta" are so different that the observations there would not be applicable to the situation here presented; likewise as to Union Pac. R. Co. v. Perrine (C. C. A.) 267 F. 657, and Crowell Bros. v. Panhandle Grain Co. (C. C. A.) 271 F. 129.

[27] It must also be borne in mind that great latitude is allowed in the introduction of evidence on an issue of fraud. 20 Cyc. 110; Knudsen v. Domestic Utilities Mfg. Co. (C. C. A.) 264 F. 470; Butler v. Watkins, 13 Wall. 456, 20 L. Ed. 629.

Error is assigned as to the action of the court in sustaining the refusal of witness Everhart to answer questions propounded by the government on the ground that his answers might incriminate him. Everhart had in his possession certain Liberty Bonds, and claimed that he had them in his own right as a principal. The entire circumstances of this case are such as to arouse very grave suspicion that Everhart was attempting merely to shield others. The necessity of discussion of this question is obviated by our conclusion as to the question of fraud.

[28] V. Appellees Sinclair Crude Oil Purchasing Company and Sinclair Pipe Line Company claim certain rights which are derived from appellee Mammoth Oil Company. The Sinclair Pipe Line Company was granted an easement for pipe lines, buildings and structures necessary to operate the same. It has spent large sums in constructing the same. It has also invested large sums in constructing a pipe line system, relying on the easement or right of way granted across said naval reserve. Its stock is owned by the Sinclair Consolidated Oil Corporation and the Standard Oil Company of Indiana in equal proportions. Mr. Sinclair is or was chairman of the board of directors of Sinclair Consolidated Oil Corporation and probably its largest stockholder.

Appellee Sinclair Crude Oil Purchasing Company, evidently controlled by Mr. Sinclair, purchased from the Mammoth Oil Company 17 steel oil storage tanks on naval reserve No. 3, and became substituted as to the rights of the Mammoth Oil Company to maintain the same. This was before an attempt was made or any action taken to rescind the said contract of April 7, 1922. Are these two appellees trespassers upon said naval reserve?

It is urged that, in case of cancellation of the lease and contract, appellant be required to do equity in the consequent accounting. The rights of the Sinclair Crude Oil Purchasing Company and the Sinclair Pipe Line Company are based upon the lease of the Mammoth Oil Company. Credit in the accounting or otherwise for moneys expended by these appellees could only be allowed if they were innocent trespassers and expended the money and made the improvements in good faith.

As our conclusion is that the lease and contract were procured through fraud and corruption, each of the appellees is a mala fide trespasser on the government lands, and therefore no credit for expenditures can be allowed any of them by the court, and a full accounting of the value of the oil extracted must be rendered. Causey v. United States, 240 U. S. 399, 36 S. Ct. 365, 60 L. Ed. 711; United States v. Trinidad Coal and Coking Co., 137 U. S. 160, 11 S. Ct. 57, 34 L. Ed. 640; Pan-American Petroleum Co. et al. v. United States (C. C. A.) 9 F. (2d) 761, 773. If appellees or any of them are entitled, upon a cancellation of the lease and contract, on the ground that they were fraudulently obtained from the United States, to credit for moneys expended in carrying out said contract, such relief must come from the Congress.

The decree and judgment of the trial court, dismissing the bill of the United States, is reversed, and the case is remanded, with instructions to the trial court to enter a decree (a) canceling said lease and contract as fraudulent; (b) enjoining appellees from further trespassing upon the lands of appellant described in said lease; and (c) providing for an accounting on the part of appellee, Mammoth Oil Company, for the value of all oil and other petroleum products taken under said lease and contract.

Reversed and remanded.